UNITED STATES of America, Appellee,

v.

CUSTER CHANNEL WING CORPORATION and Willard R. Custer, Appellants.

No. 10399.

United States Court of Appeals Fourth Circuit.

Argued Feb. 8, 1967.

Decided April 3, 1967.

Vincent L. Gingerich, Takoma Park, Md. (Keith L. Seegmiller, Washington, D. C., on brief), for appellants.

Richard M. Phillips, Sp. Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., and Roy Nerenberg and Clarance E. Beaver, Attys., S. E. C., on brief), for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

Appellants, Custer Channel Wing Corporation and Willard R. Custer, its president, were convicted of criminal contempt for violating an injunction issued by the District Court, permanently enjoining them from engaging in acts or practices that would constitute a violation of section 5 of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c) (1958). This Act forbids the use of any means of interstate commerce or of the mails to sell or offer to sell securities without having first filed a registration statement with the Securities and Exchange Commission. Exempt from the registration requirement, and hence from the injunction, are certain types of transactions listed under section 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d(1) (1958), as amended, 15 U.S.C. § 77d(2) (1964), among them "transactions by an issuer not involving any public offering." Appellants admitted having sold unregistered shares of Channel Wing stock, but maintained that the sales were a private offering within the section 4 (1) exemption. They further contended that even if it was a public offering, there was no evidence of "willful" violation of the court's injunctive order, as required for a finding of criminal contempt.

The District Court decided both contentions against the appellants and fined the corporate defendant $5,000 plus one-half of the costs, and sentenced the individual defendant to serve 183 days in prison and to pay one-half of the costs.

After the issuance of the injunction on May 25, 1962, the appellants sold 1,579,590 shares of Channel Wing Class B Common Stock, none of which was registered with the Securities and Exchange Commission. Well over half of the shares were issued to three "Associates" set up by appellants, and the remainder were issued and sold to various individuals, at least nineteen in number. The manner in which the "Associate" device operated is explained in detail in the opinion of the District Court,[1] which found that the "Associates" were not corporations, partnerships, or associations, but merely names used as conduits for the sale of stock to some 136 individuals.

**I**

The question whether the sale of Channel Wing stock was a public offering, required to be registered with the Securities and Exchange Commission, or a private offering exempted from registration by section 4(1), is controlled by the Supreme Court's decision in S E C

---

I. 247 F.Supp. 481, 486 (D.Md.1965).

v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). There, the Securities and Exchange Commission sought to enjoin Ralston Purina Company's offerings of unregistered stock to its employees, and the problem before the Court was to determine the scope of the private offering exemption of section 4(1). Since "public offering" is not defined in the Securities Act, the Court looked to the purpose of the Act, which it declared was "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." 346 U.S. at 124, 73 S.Ct. at 984. Interpreting the section 4(1) exemption in the light of this statutory purpose, therefore, the Court expressed the view that a transaction is exempt when the particular class of offerees had "access to the same kind of information that the act would make available in the form of a registration statement." Id. at 125–126, 73 S.Ct. at 985. The Court thus made it clear that only where an offering is "to those who are shown to be able to fend for themselves" may the transaction be deemed a private offering.

■ In the present case the District Court found that none of the purchasers of Channel Wing stock had access to the kind of information that would have become available to them through a registration statement. Applying the *Ralston Purina* test to the sale of Channel Wing securities, it is evident that the transaction was a public offering.

Appellants argue that the District Court erred in finding that the individual purchasers were not able "to fend for themselves," noting that they were "sophisticated investors" and "businessmen of mature experience." But "sophistication" is not a substitute for "access to the kind of information which registration would disclose." 346 U.S. at 127, 73 S.Ct. at 985. Schedule A of the Securities Act, 15 U.S.C. § 77aa (1958), lists 32 categories of information that should be included in a registration statement.[2] This type of information is designed to protect the investor by furnishing him with detailed knowledge of the company and its affairs to make possible an informed investment decision. A purchaser of unregistered stock must be shown to have been in a position to acquire similar information about the issuer.

■■ Since section 5 is for the protection of the public, the terms of the exemption must be strictly construed against the one claiming it, and the burden of establishing the exempt character of the transaction rests on him who claims the exemption.[3] It is evident that appellants failed to meet this burden since the District Court found, with full support in the record, that most of the individual purchasers "were not furnished, nor did they have, anything more than the vaguest information about the financial affairs of Channel Wing." 247 F.Supp. at 487. Even the few purchasers shown by the evidence to have gained access to the pertinent information when they later became directors of the corporation, lacked such access at the time they purchased most of their stock. Furthermore, since the Dis-

---

2. Some of these categories are: the nature and general character of the issuer's business; its capital structure; the remuneration to be paid to the issuer's directors and to its officers and other employees, and the nature and extent of their interest in any property acquired; an estimate of the net proceeds to be derived from the security offered; amounts, itemized in "reasonable" detail, of expenses incurred in connection with the sale of the security; a detailed balance sheet of the assets and liabilities of the issuer certified by an independent public or certified accountant; a profit and loss statement of the issuer showing earnings and income; the names and addresses and a copy of the opinions of counsel who have passed on the legality of the issue; and a copy of the issuer's articles of incorporation and of its by-laws.

3. SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981 (1953); SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959); Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir. 1959); United States v. Attaway, 211 F. Supp. 682 (W.D.La.1962); SEC v. Mono-Kearsarge Con. Min. Co., 167 F.Supp. 248 (D. Utah 1958).

trict Court found that the "Associates" were not "legal entities," but merely conduits for the sale of stock to numerous individuals, none of whom had any connection with Channel Wing, it is clear that these 136 investors also were without access to the type of information required by Schedule A.[4]

A further contention advanced by the appellants is that *Ralston Purina* does not apply where the securities are held for investment, where resale is restricted, and where the number of transferees is limited, since in that case the company offered its stock to hundreds of "key employees" without imposing any restriction on immediate resale. Channel Wing and its president required each prospective purchaser to sign an investment letter acknowledging that he knew that the stock was not registered and that the corporation had been enjoined from certain stock sales, and included an agreement that the purchaser would not resell the stock for a period of 13 months.[5] Appellants also caused a legend to be imprinted on the face of each certificate restricting transfer. They assert that these steps having been taken, the transactions were a private offering.

■■ We think that the appellants misconceive the function of these measures. Although such precautions are

taken by issuers relying on the exemption of section 4(1) to ensure that their purchasers shall not in turn distribute securities to others who might not have "access to the kind of information which registration would disclose," even though the initial purchasers possessed such information, "these are only precautions [to prevent illegal distributions] and are not to be regarded as a basis for exemption from registration."[6] The signing of an investment letter and the imprinting of a legend on the stock certificates are not sufficient to constitute the Channel Wing offering a private one in the absence of proof that the purchasers actually had access to the kind of information that a registration statement would have disclosed.

■ Appellants' contention that the number of transferees must be considered in determining whether an offering is public or private, and that *Ralston Purina* is distinguishable from the present case by the fact that Ralston Purina's offering was made to hundreds of its employees scattered over a large part of the country, is refuted by the Court's opinion in that very case, which declared that "the statute would seem to apply to a 'public offering' *whether to few or many.*"[7] 346 U.S. at 125, 73 S.Ct. at 984. (Emphasis supplied.) Moreover,

---

4. The evidence disclosed that not even the three "Associates" were given or had access to the kind of information that would have been available to them in a registration statement.

5. A copy of the investment letter used by the corporation is set out in footnote 2 of the District Court's opinion. 247 F.Supp. at 485.

6. Non-Public Offering Exemption, SEC Securities Act Release No. 4552, Nov. 6, 1962.

7. In Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir. 1959) it was argued that an exception to the standard announced in *Ralston Purina* should be made for cases in which the number of offerees or purchasers is small; in *Gilligan* there were only four purchasers. Judge Lumbard, speaking for the court in *Gilligan*, defined the *Ralston Purina* standard as follows:

"[T]he governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration [sic] would have disclosed, or have access to such information."

267 F.2d at 466. He noted that in adopting this test for determining whether an issue is a public offering, "the Ralston Purina case *clearly rejected a quantity limit* on the construction of the statutory term." *Id.* at 467. (Emphasis supplied.)

As early as 1935, the Commission stated that:

"In no sense is the question [what constitutes a public offering] to be determined exclusively by the number of prospective offerees."

SEC Securities Act Release No. 285, Jan. 24, 1935.

since the District Court justifiably found that the "Associates" could not be considered "legal entities," the sale of shares was in fact not restricted to a limited group. The total number of purchasers was more than 150 and the government's exhibits indicate that Channel Wing stock was offered to at least seventy others during the same period.[8]

## II

Both in the District Court and here the appellants have vigorously insisted that for them to be adjudged in criminal contempt, it is not enough to show that they intentionally committed the acts constituting the violation with full knowledge of all relevant circumstances; there must, it is argued, also be proof beyond a reasonable doubt of "evil purpose or bad motive on their part," that is, "proof of specific intent to violate the injunction."

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1958), provides that it is unlawful to utilize any means of interstate commerce or the mails to sell or offer to sell unregistered securities. Section 24 of the Act, 15 U.S.C. § 77x (1958), makes it a crime "willfully" to violate section 5.[9] The Supreme Court has said that the word "willfully" does not necessarily mean done with a bad purpose, but may be

> "employed to characterize a thing done without ground for believing it is lawful, * * * or conduct marked by careless disregard whether or not one has the right so to act * * *."

United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 78 L.Ed. 381 (1933).

A number of courts have indicated that in criminal prosecutions for violation of section 5, it is not necessary to prove specific intent to violate the law. All that need be shown to sustain a conviction is that the defendant has intentionally sold or offered to sell unregistered securities through the mails or in interstate commerce.[10] It has also been held that an injunction may be granted for a violation of section 5

> "even though it is not demonstrated that the violations or threatened violations furnishing its basis are wilful in the special sense of being fraudulent, in bad faith or with deliberate intent to violate known requirements of law. * * * [E]ven though violations fall short of those that would

8. "[The number of offerees] does not mean the number of actual purchasers, but the number of persons to whom the security in question is offered for sale. The word 'offering' in this sense should not be limited to those cases wherein a formal proposal for a firm commitment is submitted. Any attempt to dispose of a security should be regarded as an offer."
SEC Securities Act Release No. 285, Jan. 24, 1935. See SEC v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

9. 77x. Penalties
"Any person who willfully violates any of the provisions of this subchapter, * * * shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both."

10. In Kistner v. United States, 332 F.2d 978 (8th Cir. 1964), it was pointed out that to sustain a conviction under section 5
"the Government must prove *only* that the defendant caused to be carried in the mails a security unregistered with the Security and Exchange Commission,"
distinguishing this from the proof required under section 17 of the Act, 15 U.S.C. § 77q: that "the defendant *with intent* committed a fraud." *Id.* at 981. (Emphasis supplied.) See also Estep v. United States, 223 F.2d 19 (5th Cir.), cert. denied, 350 U.S. 863, 76 S.Ct. 105, 100 L.Ed. 765 (1955); Stone v. United States, 113 F.2d 70 (6th Cir. 1940). A district court in the Third Circuit has ruled even more explicitly that
"it was sufficient to establish that the defendants willfully and intentionally sold or delivered unregistered securities by use of the mails. * * * [I] do not now conceive an element of the crime charged * * * [violation of section 5] to be actual knowledge that a security was being sold in violation of the law."
United States v. Sussman, 37 F.Supp. 294, 296 (E.D.Pa.1941).

be wilful in a criminal sense, the Court may infer from a wanton or even careless willingness to take a chance on the legality of questionable transactions that a defendant is about to similarly violate the Act if afforded an opportunity to do so * * *." S E C v. Mono-Kearsarge Con. Min. Co., 167 F.Supp. 248, 261 (D.Utah 1958). See 15 U.S.C. § 77t (1958). Clearly, if in a direct criminal prosecution or in a proceeding for injunctive relief, it is sufficient to show that the act of selling unregistered stock was willful and intentional, without the necessity of showing evil purpose or bad motive with specific intent to violate the law, no more stringent test of guilt should be required in a proceeding for criminal contempt for violation of an order enjoining the defendant from engaging in acts forbidden by the statute.[11]

Appellants argue, however, that other cases, while not expressly requiring a showing of evil motive with specific intent to violate section 5 before a "willful" violation may be found, can be read to imply such a requirement. They cite in particular United States v. Crosby, 294 F.2d 928 (2d Cir. 1961). This was an appeal by a stock brokerage firm and seven individuals who were found guilty of fraud and conspiracy on a 50-count indictment, in which some of the defendants were charged with willfully and knowingly using the mails to sell stock admittedly unregistered. They contended that there was not the "necessary knowledge" to support the element of willfulness. In discussing this question, the court stated that "there was no evidence that the brokers knew *or should have known* they were 'underwriters' in terms of the Securities Act." (Emphasis supplied.) This language implies that the court was concerned with the sufficiency of the proof of knowledge, rather than with the nature of the intent required by the word "willful."

The later case of United States v. Dardi, 330 F.2d 316 (2d Cir. 1964), supports the view that *Crosby* was decided on the basis of insufficient proof of knowledge. Furthermore, the *Dardi* opinion does not discuss the need for proof of specific intent, but says that "the crucial issue as to the broker-dealers' guilt is whether they *knew* that they were selling for a 'control' group." Id. at 325. (Emphasis supplied.) Thus, again, the concern appears to be with the necessary knowledge and not with an evil motive or specific intent to violate the law. We think, therefore, that these cases do not cut against those discussed above which indicate that specific intent is not a requisite element of the offense.

At common law, the fundamental concept of crime embraced an element of evil intent, and in the absence of legislative instructions to the contrary, statutory crimes were interpreted as requiring a similar element. United States v.

---

11. Similar rulings have been made in respect to violations of injunctions involving other federal regulatory statutes. See United States v. Schlicksup Drug Co., 206 F.Supp. 801 (S.D.Ill.1962), holding that in a proceeding for criminal contempt for violating an injunction restraining defendant from delivering into interstate commerce adulterated drugs in violation of the Federal Food, Drug, and Cosmetic Act, § 301(a), 21 U.S.C. § 331(a) (1958), the government need not prove specific intent to violate the injunction. The court reasoned that there is an "interrelationship between the criminal remedial provisions of the Act and a contempt proceeding growing out of the violation of a remedial order based upon the Act." *Id.* at 805. Since adulteration of drugs could be enjoined without proving any specific intent, it would be "anomalous" to require proof of specific intent in continued violations of the Act, and in violation of an injunction. The court distinguishes United States ex rel. Porter v. Kroger Grocery Baking Co., 163 F.2d 168 (7th Cir. 1947), which required proof of specific intent in a contempt proceeding for violation of an injunction issued pursuant to provisions of the Emergency Price Control Act, on the ground that specific intent had been held to be an essential element of the criminal sanctions imposed by that statute and that "the contempt proceeding partook of the character of the substantive crimes created by the statute." 206 F.Supp. at 806.

Carll, 105 U.S. 611, 26 L.Ed. 1135 (1881). With the advent of modern economic, industrial, and urban conditions, however, new statutory crimes—"public welfare offenses"—were created which did not depend on *any* intent as a necessary element, although in the case of certain public welfare offenses, Congress deemed it desirable to make some form of intent an element of the offense.[12] Justice Jackson's opinion in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), contains a philosophic discussion of the basic element of *mens rea* or evil purpose, and an analysis of the development of a less stringent rule for public welfare offenses. He declined, however, to undertake

> "to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled not static."

342 U.S. at 260, 72 S.Ct. at 248.

■ Nor is it within the scope of this opinion to lay down a broad rule identifying the laws that make specific evil intent indispensable to the imposition of criminal sanctions. It is sufficient for the present purpose to speak more restrictively. The appellants had already breached the law and had been enjoined not to do so again; yet they knowingly repeated the selfsame forbidden acts. It is not consonant with reason, in these circumstances, to demand a more explicit demonstration of an evil mind in order to sustain the conviction for criminal contempt. See Roe v. United States, 316 F. 2d 617, 623 (5th Cir. 1963), a prosecution for violation of section 5, holding that the "best proof" of the requisite willfulness "would be a prior conviction [defined by the court to include "other significant judicial actions such as an injunction"] of the very same defendant for acts substantially identical."

The facts cannot possibly be fitted into the pattern of an innocent stumbling into an unintended transgression. The injunction pointedly brought to the defendants' attention their past infraction of the Securities Act and laid down a specific admonitory prescription to guide their future course. As the District Court noted, appellants, thus warned, should have been more than normally careful in their behavior not to repeat the offense.

■ There is no occasion to adduce further proof of evil intent here for it is immaterial. Even if material, the factual background supplies the proof. The District Court found that the evidence demonstrated beyond a reasonable doubt that appellants had full knowledge of the acts constituting the violations and participated in such acts intentionally. The appellants knew that the individuals purchasing directly from them, as well as those making their purchases through the "Associates," had no access to the

---

12. A number of regulatory statutes require a "willful" violation to sustain a criminal conviction. This court, speaking through Judge Parker, has held that in a prosecution for a violation of the Elkins Act, 49 U.S.C. § 41 (Supp.1951), where the maximum penalty is two years' imprisonment or a fine of $20,000, or both,

> "the use in the act of the word 'wilful' does not require that there be an evil intent to commit the offense, but that it is sufficient if the act was done knowingly."

Powell v. United States, 112 F.2d 764, 767 (4th Cir. 1940). See Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908), quoted extensively by Judge Parker in the *Powell* case.

See also United States v. Gris, 247 F.2d 860 (2d Cir. 1957) [violation of proscription against wiretapping, sections 501 and 605 of the Communications Act of 1934, 47 U.S.C. §§ 501, 605 (1958)]; United States v. Keegan, 331 F.2d 257 (7th Cir. 1964) [section 302 of the Labor Management Relations Act, 29 U.S.C. § 186 (1964)]. In *Gris*, the court held that

> "It matters not whether appellant realized his conduct was unlawful. He knew exactly what he was doing; and what he did was a violation of the Federal Communications Act. He intended to do what he did, and that is sufficient."

247 F.2d at 864.

type of information concerning the corporation that a registration statement would have disclosed. Although the defendant Custer introduced testimony designed to show unawareness on his part that the purported sales to the "Associates" were in fact sales to individuals having no contact with the corporation, the District Court found this testimony "totally unworthy of belief." We agree with the District Judge that the documentary evidence, fortified by additional testimonial evidence, clearly permits the finding.[13]

■ Defendant Custer presents the further contention that a conviction is barred by his alleged reliance on the advice of the corporation's lawyer, his now deceased brother, that the sale of Channel Wing stock was not a public offering. Elsewhere we have held that reliance on legal counsel may be considered in determining the question of good faith, but does not always constitute a complete defense. Linden v. United States, 254 F.2d 560, 568 (4th Cir. 1958).[14] Good faith is

a relevant consideration on an issue of specific intent where a pertinent inquiry would be whether defendant acted with bad motives. Bisno v. United States, 299 F.2d 711, 719 (9th Cir. 1962); Licavoli v. United States, 111 U.S.App.D.C. 11, 294 F.2d 207 (D.C.Cir. 1961). See also SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959).

■ In any event, the District Court in our case found as a fact that the defendants did not in good faith rely upon the advice of counsel, for they sold and issued stock to persons far in excess of the maximum number cautiously advised by the lawyer.[15]

■ It has been asserted, and we assume, that in this instance the stock sales were undertaken without intent to defraud the purchasers, but in a desperate endeavor to save a business from failing for lack of sufficient capital. Doubtless this is a proper consideration in assessing the penalty; it constitutes no defense.

The judgment of the District Court is Affirmed.

---

13. The hollowness of the defense may be illustrated by one example from many in the voluminous correspondence offered in evidence, indicating the nature of the arrangement for sales to the "Associates." A letter to Custer from Bruce Wallace, one of the three "Associates," transmitting checks totaling $63,550 for the purchase of 154,000 shares of stock, named nineteen persons in whose names certificates should be issued, and designated the denominations of the certificates. Custer, in replying, returned some of the checks, referring to them as the checks "I talked with you about * * * which cannot be accepted by this Corporation." Custer went on to instruct Wallace to "Please handle this matter of the enclosed check as per our phone conversation, along with any additional friends who become part of the Bruce Wallace Associates in one personal check." This evidences Custer's knowledge of the acts constituting a violation. The District Court was warranted in concluding that appellants realized that if they sold directly to individuals, instead of through the "Associate," the violation would become manifest, and that the "Associate" device was a bald attempt to evade the injunction.

14. "As a general rule, reliance on the erroneous advice of competent counsel will not relieve an individual of his responsibility for acting in accordance with court orders, and will not enable him to escape conviction and punishment for contempt if he disregards the orders."
Note, Reliance on Advice of Counsel, 70 Yale L.J. 978, 992 (1961).

15. "The first prerequisite to successful invocation of the defense of advice of counsel is that the advisee must follow the advice of his attorney without variation."
Note, Reliance on Advice of Counsel, 70 Yale L.J. 978, 979 (1961).
In oral argument, it was pointed out that if despite the defendants' past experience as violators of § 5 and the consequent injunction, they still entertained a good faith doubt as to the application of the registration requirements to their activities, they could have obtained an advisory opinion letter from the Commission. They made no attempt to do so.