**UNITED STATES of America, Plaintiff,**

**v.**

**David L. HILL, Defendant.**

**Crim. No. 12396.**

United States District Court
D. Connecticut.

April 9, 1969.

**1224**

Jon O. Newman, U. S. Atty., Hartford, Conn., Willis H. Riccio, S.E.C., Boston, Mass., for plaintiff.

Charles G. Albom, New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

Upon application of the United States Attorney and the Securities & Exchange Commission (SEC), the defendant, Dr. David L. Hill, has been summoned before this Court to show cause why he should not be held in criminal contempt of this Court's permanent injunction of July 17, 1967. The Government alleges that since the entry of the injunction, the defendant Hill has undertaken actions which violate §§ 5 and 17(a) of the Securities Act of 1933 and the injunction; it now seeks a contempt judgment and an order for appropriate remedies. The Court finds that the defendant is in contempt of Court, in that he did violate the terms of the injunction by selling securities which were required to be registered under § 5 of the Act and by omitting to state necessary material facts as required by § 17(a) when he sold said securities.

On June 28, 1967, the SEC applied to the Court for injunctive relief against Southport Instruments, Inc. and Hill alleging that they had violated § 5(a) and (c) (the unlawful sale of unregistered stock) and § 17(a) (the fraud provisions) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), (c), 77q(a). An injunction order was stipulated and consented to by the parties on July 17, 1967 and a copy was served on Hill on July 19, 1967.[1] Basically, paragraphs a, b, and c

---

1. "IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendants, Southport Instruments, Inc. and David L. Hill, their officers, agents, servants, employees, attorneys and assigns and each of them, be and hereby are permanently enjoined from:
Directly and Indirectly:
a) making use of any means or instruments of transportation and communication in interstate commerce or of the mails to offer to sell through the use or medium of any prospectus, or otherwise, securities of Southport, or any other securities, unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities, or while a registration statement filed with the Securities and Exchange Commission as to such securities is the subject of a refusal order or stop order of the Securities and Exchange Commission or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act of 1933;
b) making use of any means or instruments of transportation and communication in interstate commerce or of the mails to sell the securities of Southport, or any other securities, through the use or medium of any prospectus, or otherwise, unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;
c) carrying the securities of Southport, or any other securities, or causing such securities to be carried, through the mails or in interstate commerce by any means or instruments of transportation for the purpose of sale or delivery after sale, unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;
(Provided, however, that nothing in the foregoing portion of the requested injunction shall apply to any security which is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended.) and
d) in the offer or sale of 10¢ par value common stock of Southport, or any

of the injunction closely track the statutory language and prohibit the defendants from directly or indirectly violating § 5(a) and (c) of the Act with respect to the securities of Southport or "any other securities." The injunction does not "apply to any security exempt from the provisions of § 5." This preserves to the defendants the "exempted securities" provisions of § 3 of the Act; the parties have also treated it as preserving the "exempted transactions" provisions of § 4. Paragraph d of the injunction applies to the sale of Southport common stock and "any other securities" and closely tracks § 17(a), embodying the full reach of § 17(a), but also barring certain enumerated practices.

Before examining each claimed violation of the injunction, the general factual setting must be presented. The enterprises involved here were formed in 1960 to engage in activities related to nuclear instrumentation and computers. Since 1962, Hill has conducted his operations primarily through two corporations; namely, Southport which changed its name to Nanosecond Systems, Inc. in 1967 (referred to hereafter as Nanosecond) and Particle Measurements, Inc. (PMI), the parent of Nanosecond.

Hill founded Nanosecond and has been its controlling stockholder since inception. He has maintained this control in part through Bonnybrook Charitable Trust, a Nassau Trust, in which he holds a substantial interest. Bonnybrook was formed by Hill for the benefit of his family and he exercises control over it.

During the period under consideration, Hill and Bonnybrook controlled, directly or indirectly through PMI, 79.2% of the outstanding shares of Nanosecond. (final prospectus, pp. 5, 25).

Nanosecond has been engaged primarily in research and development of new products and has incurred substantial losses since its inception. Consequently, there has been an almost constant need for outside funds. At the time of the 1967 injunction Nanosecond was in the process of preparing a registration statement under the Act to cover the sale of common stock. The registration statement was filed with the SEC on August 28, 1967. At that time, he had expected it to become effective within about two months. However, Nanosecond's filing went through six amendments, several involving substantial rewrites, and did not become effective until over 16 months later, on December 30, 1968.

It is Hill's actions in sustaining the Company through this registration period which form the basis for the current action. Through a series of complex moves in 1965, PMI became a parent of Nanosecond, holding as of September 30, 1968, 885,999 shares constituting 70% of the stock. Hill and Bonnybrook own 93.3% of the outstanding PMI common stock. To finance the companies, PMI sold $895,900 worth of short-term notes to various individuals between July 1967 and October 1968. These were 6-month subordinated notes, bearing interest at 6%. Beginning at least as early as October 1967, and applied retroactively to the

other securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails to:
1. employ any device, scheme or artifice to defraud.
2. engage in any transaction, practice or course or business which operates or would operate as a fraud or deceit upon purchasers; or
3. obtain money or property by means of omissions to state material facts necessary to be stated in order to make statements made about Southport and its securities, in light of the circumstance under which they were

made not misleading, concerning:
i. the financial condition of Southport;
ii. the offering price of Southport's stock;
iii. the exercise of options for Southport's stock;
iv. a dilution of the value of Southport's stock; and
v. an employment contract between Hill, Southport's president, and Southport's operating subsidiary
or any other device, scheme, course of business, artifice and omissions of similar purport or object."

notes then outstanding, PMI also issued with each note a right to apply the principal amount of the note to the purchase of Nanosecond common stock within 25 days of the effective date of the Nanosecond registration statement at varying prices of $5, $8, or $10. Nanosecond disclosed in its December 30, 1968 prospectus that 122,500 shares had been reserved to cover these rights. It is the sale of the PMI notes and rights which is challenged here.

## Section 5 Violations

At the outset the Court notes that the scope of paragraphs a, b, and c of the injunction is coterminous with § 5(a) and (c) of the Act and that a violation of these subsections constitutes a violation of the injunction. Given this fact, in order to avoid confusion, this Opinion will analyze the issues in terms of a violation of § 5.

Hill has advanced a number of claims to support his position that there were no § 5 violations in the sale of the PMI notes. He claims that the notes and perhaps the conversion rights are exempt under § 3(a) (3) of the Act, 15 U.S.C. § 77c(a) (3), as short-term notes; that the conversion rights are exempt under §§ 5(a) and 5(c) which permit an issuer to offer to sell securities after a registration statement has been filed but requires that it postpone the final sale and delivery until after the registration statement has become effective; and that the entire offering of notes is exempt under § 4(2), 15 U.S.C. § 77d(2), as a private placement not constituting a public offering.

Initially, to violate § 5, it is required that the offeror "make use of any means or instruments of transportation or communication in interstate commerce or of the mails." Hill cannot persuasively contend that the requisite interstate activity has not been shown. The evidence revealed sales in at least 10 states and one foreign country (PX–V); there is an admitted telephone call between Hill in Connecticut and Traub, a note purchaser, in Massachusetts; there is also evidence of an envelope which contained a Nanosecond prospectus mailed to Glueck, another purchaser (PX–EE).

### 3(a) (3) Exemption

Hill's first claim is that he is entitled to an exemption under § 3(a) (3) which states, that except as expressly provided, the Act shall not apply to:

> Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

Before determining whether the 3(a) (3) exemption is available, the first analytical problem is whether the note and the conversion right received by the investors should be deemed as one security or two separate instruments. An examination of these instruments indicates that they represent a single security. By its terms the conversion right was tied to the note because the right to convert was exercisable only by the noteholder of record. The conversion right would thus not have been separately negotiable. With this interpretation, there is no possible basis for claiming that the security issued, a convertible note, was exempt under § 3(a) (3). However, even assuming that Hill issued two separate instruments to the investors, it is clear that the notes do not qualify for the § 3(a) (3) exemption.

There has been little administrative or judicial construction of the scope of the 3(a) (3) exemption. The legislative history indicates that both the House and Senate Committees intended to exempt commercial paper which was not generally sold to the public or advertised for public sale. In addition the House Report emphasized that exempted paper would be of the type "available for discount at a Federal Reserve Bank." Securities Act Release No. 4412 (1961). The SEC has also taken the position that

the paper must be eligible for discount at a Federal Reserve Bank to qualify under 3(a) (3). It has also stressed that the assets covering such paper must be easily convertible into cash and comparable to liquid inventories of an industrial company. Securities Act Release No. 4412 (1961). It is clearly evident here that in no way can the PMI notes in issue be deemed within the 3(a) (3) exemption. These notes were offered and sold solely to members of the public. They were highly speculative and bore no resemblance to the high grade paper issued or accepted by finance houses. Perhaps most importantly, neither PMI nor Nanosecond had assets easily convertible into cash to support these notes. In fact during the period in question, the only way PMI could repay its outstanding notes was through the sale of additional notes. The 3(a) (3) exemption was not intended, and does not extend, to cover financing by an insolvent company in its speculative attempt to launch an enterprise. This is precisely the kind of financing for which Congress considered it necessary that a company complete the registration requirements of Act.

*An Offer Permissible under 5(a) and 5(c).*

■ Defendant advanced the position that the conversion rights to purchase Nanosecond stock after the registration became effective, were permitted under §§ 5(a) and 5(c). The Court finds that this claim is completely without merit.

In order to facilitate underwriting distribution, § 5(a) and (c) permit the offer, but not the sale, of a security after a registration statement has been filed, but before it becomes effective. The essential difficulty with defendant's position, a difficulty his securities attorney conceded on the witness stand is that the rights offered by PMI are themselves defined as a security by the Act. § 2(1). Furthermore, it is indisputable that these rights were sold. Every purchaser who testified, except Sfisco, readily admitted that they were not interested in

loaning money to the companies, and that their primary interest was in making an equity investment in Nanosecond with the hope that its stock would soon substantially appreciate in value. Sfisco's testimony is not persuasive; no prudent investor would have made unsecured loans at 6% to these insolvent companies, except for the capital gain potential of the stock. Therefore, the investors who advanced money to PMI were in fact, in large part, purchasing the rights which accompanied the notes.

These rights cannot be deemed a permissible offer under § 5(a) and (c) for two reasons. First, the sale of the rights was the sale of a security for which no registration statement had been *filed,* as required by § 5(c). Nanosecond filed a registration statement covering its common stock, not rights to purchase its common stock. Second and more importantly, these rights were *sold* thereby violating § 5(a). The purpose of § 5(c) is to permit the underwriters to solicit offers from prospective investors during the registration process. However, under such circumstances, there is no risk to these prospective investors, because they do not put in any money until after the registration statement becomes effective. In PMI's case, the investors fully committed their funds to the companies when they purchased the notes and the rights, at a time long before the registration statement became effective. Thus it is almost a mockery to claim that this constituted a permissible offer under § 5(a) and (c).

*Private Placement*

■ Defendant also relies on the claim that the notes and rights were exempt under § 4(2) as a private placement not involving a public offering. The fundamental interpretation of the scope of the § 4(2) exemption was provided by the Supreme Court in SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), which involved an offering by the defendant company to a large number of its employees. Under *Ralston Purina,* as construed by this Circuit in

Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir. 1959), an offering qualifies as a private placement, if all the offerees are in such a position with respect to the issuer, that they either actually have such information as a registration statement would have disclosed, or they have access to such information.

Defendant relies upon the language in *Ralston Purina* to the effect that the private placement exemption is available where the offerees constitute a class which does not need the protection of the Act; where the offerees are shown to be able to "fend for themselves." 346 U.S. at 125, 73 S.Ct. 981. On closer examination it is evident that the language cited by the defendant does not establish a different standard than that adopted by the Second Circuit. The Supreme Court did not intend in *Ralston Purina* to exempt all offerings to experienced or sophisticated investors. No investor can be said to be sophisticated *per se;* he can only fend for himself when he has personal knowledge of or has access to the kind of information which a registration statement would disclose. See, United States v. Custer Channel Wing Corp., 247 F.Supp. 481, 487 (D. Mary.1965), aff'd, 376 F.2d 675 (4th Cir. 1967).

The evidence revealed two basic groups of individual investors: first, a group which the Court will refer to for convenience, as the "direct purchasers," and second, the "fragmentees." The direct purchasers dealt with Hill and he authorized personally the sale to each. Hill conceded that by December 30, 1968, notes had been sold to 49 direct purchasers. This number does not include any persons to whom, as Hill testified, offers were made but who did not purchase notes. However, in determining whether a public offering has been made, the focus is not merely on the actual purchasers, but on the entire group of offerees. See, 1 Loss, Securities Regulation 656 (2d ed. 1961).

Those whom the parties have called fragmentees were individuals who purchased not from Hill, but from direct purchasers. There were more than 40 fragmentees. The Court finds that in three separate respects defendant made a public offering by the sale of PMI notes: (1) by the sale to the 49 direct purchasers; (2) by the sale to certain of the fragmentees; and (3) by the sale to direct purchasers after Hill had knowledge of fragmentation.

Hill testified that he supplied direct purchasers with a copy of the then current preliminary prospectus. A substantial number of noteholders invested prior to March 15, 1968 and according to Hill's testimony, many of these persons made their investment decision on the basis of the August 28, 1967 preliminary prospectus (also referred to as the "August red herring"). (PX–A, EE–1). Exhibit 14c which accompanied the first amended registration statement listed 25 purchasers who invested before March 15, 1968. (PX–A). There was other evidence to substantiate this conclusion. George testified that he placed $25,000 in notes with two customers and that this was approved by Hill. He testified that when he did so, the two customers were given only the August red herring. Similarly, Cohen, although he dealt with Hill, had only this document.

The August red herring manifestly supplied inadequate information for any investor to rationally make an investment decision about PMI. The defects in the prospectus will be subsequently discussed in detail, when the Court considers the § 17 violations. However, the most glaring defect is the dearth of information concerning PMI. Principally, this includes the absence of any PMI financial statements, information on PMI's capital structure, the relation between PMI and Nanosecond, and the financial arrangements between the companies with respect to the monies PMI received from the notes and the rights. Yet it was in PMI that the noteholders were directly investing. Therefore the August 1967 Nanosecond prospectus gave the purchasers nowhere near the information they would have received in a *PMI* registration statement. (See,

Schedule A of the Securities Act for the information a registration statement should contain).

In addition to lacking actual knowledge, the evidence is also clear that many of these investors lacked access to the kind of information supplied in a registration statement. This group of direct purchasers was not a cohesive unit under any standards. It was a diverse group from many parts of the country, many of whom were Hill's friends and acquaintances, dating back to his early professional days. The evidence disclosed that at least two of the direct purchasers whose notes were placed through George, were completely unknown to Hill. For a group of individual investors to have the requisite access to information, there must be some relationship between the members of that group and the issuer which demonstrates that the group has access to corporate information. Illustrative of this is the relationship enjoyed by executive personnel or directors. See, Ralston Purina, 346 U.S. at 125–126, 73 S.Ct. 981; Custer, 247 F.Supp. at 487. The PMI noteholders had no such relationship or link to these companies.

■■ Defendant has asserted that he would have supplied any information an investor desired. However, this is not what is meant by access to information about the issuer. This device was utilized in a far more formal arrangement by the defendants in *Custer* to attempt to qualify the distribution as a private placement. See, 247 F.Supp. at 487–489 & n. 2. It was rejected by the courts in that case and must be rejected here. Such an arrangement would always permit a company to circumvent the registration requirements of the Act by the simple expedient of offering to open up the corporate books. Cf. SEC Release No. 33–4552 (1962). Therefore, since many of the 49 direct purchasers were shown to have lacked the information which would have been contained in a PMI registration statement and to have lacked the requisite access, the sale to this group constituted a public offering.

■ Certain of the sales to the fragmentees also constituted a public offering by Hill. Most of the fragmentees were personal strangers to the defendant and he did not know their number. But the record clearly establishes that he knew there were fragmentees. The most important group were the Laura fragmentees, several of whom testified. Laura purchased $55,000 worth of notes on January 26 and February 1, 1968. (Exhibit 14c to PX–A; PX–U). Hill testified that Laura presented him with approximately six checks to cover the full amount of the notes purchased but only one of these was his own. (See, PX–Y, BB, FF.). Hill refused to take the checks, signed them over to Laura and had Laura write one check to cover the full amount. (See also, PX–U).

The Court finds this conduct on the part of the defendant expresses a consciousness of guilt. It demonstrates that he recognized that fragmentation was prohibited under the law, but tacitly condoned and acquiesced in the violation. In so doing he concealed the actual number of noteholders. It also reveals that Hill knew when Laura was purchasing the notes, that Laura was not investing alone. Shortly thereafter Traub called Hill, advised him that he was considering buying PMI notes through Laura, and asked what Laura's authority was. Traub credibly testified Hill responded that Laura "was his agent." Hill confirmed the telephone conversation but did not recall his statement of Laura's agency. Certainly Hill knew that Traub was a fragmentee of the Laura notes. Finally, in the Spring of 1968, after the SEC contacted various Laura fragmentees, Hill came to the Boston area to meet with them and attempt to soothe their fears over the SEC investigation. During this same period Hill referred letters from these fragmentees to Laura. (See, PX–AA).

Hill also knew of two other fragmentations. An employee, Kreidler, testified

that his investment included money from five other employees. (See, PX–JJ). Hill knew other employees were involved, but did not inquire as to who they were, how many there were, or how well informed they were on their proposed investment. (See also, PX–U). Similarly, Hill testified that by March 1968 at the latest he knew that Sfisco's investment represented money from a group (see also, PX–U); yet he took no further action. The information possessed by the Laura and Sfisco fragmentees was completely inadequate. They testified that the only material they had was the August red-herring. McLean, who was making his first investment, and Levine had not even seen the red-herring. As outlined above, this prospectus was insufficient under the *Ralston Purina* standard to provide investors with the required information. Furthermore, it is evident that these investors lacked any access to corporate information. Hill had not even offered to open the corporate books to them.

When the fragmentees became investors, any semblance of a private offering ceased. The Court does not decide whether Hill can be found to have made a public offering in those cases where he did not learn of the fragmentation until after the sale was made. However, Hill cannot escape such a finding in those cases where he knew of fragmentation at the time of his own sale to the direct purchaser (Laura) or at the time of the resale to the fragmentee (Traub), and where he was in a position to take appropriate steps, but failed to do so. He may not so evade his responsibilities. Therefore, Hill made a public distribution when he sold notes to Laura knowing others were involved, and when he condoned the sale to Traub.

■ *Ralston Purina* directly concerned offerings to employees. The Court held that some offerings to employees could constitute a private placement: "one made to executive personnel who because of their position have access to the same kind of information that the Act would make available in the form of a registration statement." 346 U.S. at 125–126, 73 S.Ct. at 985. The record indicates that the Kriedler fragmentees do not qualify under this standard. Kriedler was an engineer, as were four of his fragmentees, and one member of the group was Hill's secretary. (See, Defendant's Proposed Finding of Fact, No. 74). Because they lacked the necessary access, Hill was required to provide this group with the information a PMI registration statement would have disclosed. However, Kriedler testified that only the August red herring was available, a document the Court has found to have been inadequate. Hill was extremely careless and made a public offering when he accepted Kriedler's investment knowing there were other employees involved.

■ The Court finds that Hill made a public distribution in a third respect, when he continued to issue notes to direct purchasers after he had knowledge of fragmentation. The number of offerees permitted in a private placement is, of course, not fixed. Ralston Purina, 346 U.S. at 123–125, 73 S.Ct. 981; Gilligan, Will & Co. v. SEC, supra, 267 F.2d at 467; Custer, 247 F.Supp. at 487–489. However, Hill admitted that he knew only a very small number were permitted. He also conceded that his attorney told him the limit was a "mere handful." More generous to Hill is the traditional statement that the SEC will usually permit a private offering to between 25 and 30 individuals. See, 1 Loss at 662. By March 1968 Hill had 25 direct purchasers and an unknown additional number of fragmentees. (there were actually over 40). On a more technical level, it is a fundamental requirement that the offerees of a private placement take for investment and that premature resale breaks the private placement. See, 1 Loss at 665–673; Gilligan, 267 F.2d at 467–68; Custer, 247 F.Supp. at 489–490. Thus, although Hill treated the fragmentation as the unauthorized resale of notes, those acts had converted his sale of PMI notes into a public offering.

Nevertheless after he had knowledge of this fragmentation and that the actual number of holders far exceeded the permissible maximum, Hill continued offering the notes and sold an enormous amount (over $630,000 worth were sold between March 1968 and October 1968—final prospectus, p. 35). Furthermore, Hill renewed the Laura and Sfisco notes when they matured during this period, knowing of the fragmentation. The sales during this period certainly constituted a public offering.

In considering Hill's claim that he is entitled to a § 4(2) exemption, it is to be noted that he did not utilize any of the basic techniques normally employed, when a private placement is being undertaken. He received no investment letters from the purchasers acknowledging that they were purchasing solely for investment and not for resale, even after he had knowledge of the fragmentation. See, 1 Loss at 664–73; *Custer*. This was not a strange procedure to Hill who had used it in his pre-injunction sales. He made no notations on the securities issued to indicate restrictions on resale. (See *Custer*) and he did not apply for an SEC "no action" letter, whereby the Commission staff will give an opinion on the legality of proposed actions.

 Thus in summary, the claim that the sale of the PMI notes was a private placement is without merit. The sales to these direct purchasers were a public offering; Hill made a public offering when he permitted certain of the sales to the fragmentees, and all sales after Hill had knowledge of fragmentation constituted a public offering. As a general rule, the burden is on the defendant to prove the exempt character of the transaction; in this instance a private offering exemption. See, Ralston Purina, 346 U.S. at 126, 73 S.Ct. 981; Gilligan, 267 F.2d at 466; Custer, 376 F.2d at 678. Without placing the burden on this defendant, the Court finds that the Government has established beyond a reasonable doubt that Hill engaged in a public offering. Thus the Court finds that in selling the PMI notes

and the associated rights, Hill was not entitled to any exemptions and the offering should have been registered pursuant to § 5 of the Act.

### Section 17 Violations

In addition to § 5 violations, the Government has alleged that the defendant violated § 17(a) of the Act and paragraph d of the injunction. Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Paragraph d of the injunction, set forth in *note 1, supra,* enjoins certain particular practices in the sale of Southport stock or any other securities, but also prohibits in general terms a violation of § 17(a). It should be noted, however, that the injunction does not cover the first part of § 17(a) (2) relating to the making of an untrue statement of a material fact. This variation is not relevant here as there is no allegation that Hill made false statements to PMI note purchasers.

With this one exception, it is evident that the injunction was intended to encompass § 17(a); and thus a violation of § 17(a) is a violation of the injunction. Thus the discussion below will be cast in terms of a violation of § 17(a). The defendant concedes that the defenses which have been raised to a violation of § 5 are inapplicable to § 17. See, § 17

(c) and § 4. Thus the § 17 issues would remain even if the notes did not have to be registered under § 5.

The allegations against Hill concern a violation of the second part of § 17(a)(2). The standard to be applied in determining whether a person has omitted to state a material fact is now well settled in this Circuit. Most of the recent litigation in this area has concerned the SEC's Rule 10b–5. The essential terms in Rule 10b–5 are identical to those in § 17(a) and their scope is coterminous. Cf. Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463–464 (2d Cir. 1952); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 & n. 22 (2d Cir. en banc 1968).

The Court of Appeals has ruled that the question of whether there has been an omission of a necessary material fact is to be judged by an objective standard and not by a subjective standard. It defines a material fact as a fact to which "a reasonable man would attach importance * * * in determining his choice of action in the transaction in question." SEC v. Great American Industries, Inc., 407 F.2d 453, n. 5 (2d Cir. 1968); SEC v. Texas Gulf Sulphur, *supra* at 848–849.

The SEC's definition of material for the purposes of the Securities Act is in basic accord:

> "The term 'material,' when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered." Securities Act Rule 405, 17 C.F.R. § 230.405.

■ The dispute here centers on Hill's use of the August 28, 1967 prospectus, which the Government claims omitted to state necessary material facts, to sell the PMI notes. In the discussion of the private placement exemption the Court found that a number of the direct purchasers utilized this prospectus in deciding to invest in PMI notes. The sole information on these companies possessed by the Laura fragmentees was the August red herring. Hill asserts that he should not be charged with any omissions in the document as far as this group is concerned, because he only intended to deal with Laura. However, the evidence is clear that when Laura first invested, Hill knew or should have known that others were investing. Similarly, when Traub telephoned, Hill was again on notice that others were being brought in. With his knowledge, Hill therefore cannot evade responsibility, if the Laura fragmentees were defrauded through the use of the August prospectus. Thus, Hill violated § 17(a) in sales both to a number of direct purchasers and to the Laura fragmentees if the August red herring omitted to state the necessary material facts.

■ The basic defect in the prospectus was its omission of information on PMI. Although the investors' eventual goal may have been an investment in Nanosecond, Hill was asking them to invest in PMI. A reasonably prudent investor would want to know and would attach great importance to a disclosure of the risks involved in investing in PMI. The Court finds that the prospectus contained three categories of omissions of material facts concerning PMI, which under the circumstances were necessary to be stated, in order to make the statements made not misleading.

First, PMI had no funds available or any expectation of funds from any source with which to pay interest on the notes or to redeem the notes at maturity. PMI was insolvent and its current liabilities were 40 times its current assets. PMI had no right to any cash held by Nanosecond as it made an equity investment in Nanosecond by purchasing units of common stock and rights. Thus PMI could only pay interest on the notes or redeem them out of the proceeds from the sale of additional notes. The notes were sold to give the investors a degree of safety not enjoyed by stockholders. However, the true facts revealed that the use of this technique provided the noteholders with almost no added safety in their investment.

Second, those investors who knew of the difference between PMI and Nanosecond believed they were investing in the parent corporation as a conduit to Nanosecond. They were not told that a portion of the money would not go, or had not gone, to finance struggling Nanosecond. Of the $895,900 invested in the notes, only $760,000 reached Nanosecond. Over $35,000 was invested in other companies, over $27,000 was paid to the PMI management, almost all of which went to Hill, and a $12,000 personal loan was also made to Hill. (final prospectus, p. 35, 12).

Finally many of the noteholders were not told how many other notes were outstanding. This would have been an important factor in determining the degree of risk involved. Among those not told were Bove, Reeves, Cohen and George. Hill approached the group in February 1968, asking that they purchase $50,000 in notes. They each testified that they believed the $50,000 was to be the sole amount of notes outstanding. In fact, however, $309,000 worth had already been issued. Reeves and Cohen each invested $12,500 and George placed $25,000 with two of his customers. Hill asserted that he had informed these purchasers of the other notes outstanding and he introduced a letter to the counsel for Bove's underwriting firm which stated that PMI had recently purchased $225,000 worth of Nanosecond stock. (DX–15). The Court finds that the Bove group did not know that a large amount of notes were outstanding. Each member of the group was certain and persuasive on this point in his testimony; DX–15 was clearly insufficient to put them on notice.

The Government also asserts that it was misleading for Hill not to tell the noteholders that the Nanosecond registration statement might not become effective. Certainly he firmly believed that it would become effective eventually; and while this was extremely important to the holders of the rights, the Court deems it a fact which a reasonable investor would be cognizant of and

failure to disclose it did not constitute a § 17 violation.

The August red herring supplied at least some information on Nanosecond. However, a review of the document leads to the conclusion, that taken as a whole, it creates a misleading impression. The reader received no indication of the extremely speculative nature of an investment in Nanosecond. The red herring contains numerous unwarranted predictions. (see e. g., pp. 3, 8); it appreciably overstates the sales figure (p. 8); in reference to its business it repeatedly refers to the company and its products in such terms as "has established a reputation for technical leadership;" "has been a leader;" "has no peer;" "led the way;" "led the trend;" etc. (pp. 7–9). Almost all the textual sections of the prospectus support the conclusions that the overall tenor of the document is misleading. A full and fair disclosure would not have created such an impression.

Even if it were conceded that Hill was not aware of the defects in the prospectus when he submitted it, the SEC's comment letter, dated November 14, 1967, (PX–C) certainly put him on notice. The first page of the letter states:

"In our opinion, the prospectus included * * * is an inadequate instrument, under the standards of the Securities Act of 1933, for conveying to prospective investors a fair presentation of the material characteristics of the venture, and the general effect of the prospectus as an entirety would be to create a misleading impression in the minds of prospective investors. This is evidenced by the failure to present the required information in a clear manner, and particularly, by omission of necessary information which should be disclosed to prospective investors in order to enable them to make informed judgments as to whether or not to purchase the securities."

By utilizing the August 1967 red herring to sell PMI notes, the defendant

failed, as required by § 17(a), to state material facts necessary to inform a reasonably prudent investor of the speculative nature of the investment in Nanosecond (through PMI).

Another aspect of the case demonstrates the need for requiring Hill to make full disclosure in a prospectus. Hill testified that he has been a perennial optimist about his companies. This is of course only natural. He admitted that on a series of occasions, he has made the prediction that Nanosecond would soon make a profit. He made such a prediction to the SEC investigator Riccio in May 1968. On the witness stand he also asserted that he expected Nanosecond to turn the corner in 1969. Consistent with this optimism, Hill admitted that in his pre-injunction sales of Southport securities he had utilized a financial statement showing the results of the only profitable quarter the company had ever had. The use of this financial statement continued even after the results of subsequent quarters indicated that the company was back in the red. The optimism evidenced by Hill's predictions creates a distinctly misleading impression which is almost impossible to control, unless the lawful requirements of a prospectus are enforced.

*Knowledge and Intent*

▉ The question of the degree of knowledge and intent required to find a criminal violation of § 5 was considered at length by both the District Court and the Circuit Court in *Custer*. See, 247 F.Supp. at 490–495; 376 F.2d at 680–683. In accepting the conclusions of the courts in *Custer*, it is sufficient to note that in order to find a violation of § 5, the trier need not find specific intent, but there must be a finding that the defendant had "knowledge" of the facts which constitute a statutory violation. Although this rule was ambiguously stated in United States v. Crosby, 294 F.2d 928, 938–942 (2d Cir. 1961), the standard was fully clarified in United States v. Dardi, 330 F.2d 316, 325–327 (2d Cir. 1964).

▉ There can be no doubt that Hill possessed the facts showing a § 5 violation. He caused the notes and rights to be issued and sold. He knew the facts from which the Court found he was not entitled to a private placement exemption. Hill personally sold the notes to the 49 direct purchasers. The Court has already found that he had knowledge of sales to the Laura and Kriedler fragmentees; and that he had knowledge of the information possessed by these noteholders and their lack of access to information. Finally Hill personally sold notes after he had knowledge of these fragmentations. The Court has found each of these series of sales to be a public distribution. Furthermore, after the SEC hearing on May 17, 1968, (PX–X) Riccio advised Hill, that it was his unofficial opinion that the sale of the notes violated the injunction. Nevertheless, Hill continued to sell the PMI notes and rights through October 1968.

▉ In the recent en banc decision in SEC v. Texas Gulf Sulphur, *supra*, the Second Circuit followed two recent 7th Circuit decisions and ruled that a conviction under § 17(a) (2) does not require specific fraudulent intent. See, 401 F.2d at 854–855 & n. 22; SEC v. Van Horn, 371 F.2d 181 (7th Cir. 1966); United States v. Schaefer, 299 F.2d 625 (7th Cir. 1962). Nevertheless, there is still a requirement of scienter or knowledge. 401 F.2d at 866–869 (concurring opinion adopted by a majority). However, the facts of this case amply demonstrate the requisite scienter. Hill knew all the material facts about both companies. He chose to sell the notes and rights on the basis of the August red herring which omitted necessary facts concerning both PMI and Nanosecond. After the SEC's comment letter, he certainly had knowledge that the document was misleading and inadequate.

*Opinion of Counsel*

After July 1967, Hill received oral advice from his New York securities attorney, Gedalecia, which culminated in a written opinion of counsel, dated Janu-

ary 6, 1968, signed, not by the law firm, but by Gedalecia's partner. (DX–7). Hill argues that he was entitled to rely upon the opinion. While the opinion was not a model of clarity, it stated (1) that the "notes" were exempt under § 3(a)(3), and (2) that the "transactions" were exempt under § 4(2); it further stated that in the opinion of counsel there had been no violation of the injunction. Both Gedalecia and Hill agreed that the opinion was not intended to, and did not, relate to § 17. Therefore, the Court's finding of § 17(a) violations is in no way affected.

■ Fundamental requirements for any claim of reliance on counsel's opinion is that all relevant information was submitted and that the opinion was followed. Custer, 247 F.2d at 502–503; 376 F.2d at 683 & n. 15. Gedalecia stated that the issuance was a private placement on the basis of the list submitted by Hill on December 22, 1967 containing 15 names. (DX–7–A). This list was accompanied by a letter (PX–MM), which stated that it contained the names of the noteholders on November 30, 1967. The list did contain the names of four purchasers who first invested in December (one invested on December 22nd). However, an examination of Exhibit 14(c) (PX–A) filed with the SEC on March 15, 1968, indicates that Hill failed to disclose four other purchasers who invested before December 22nd: Davis ($16,-000); Inglis ($13,500); Silverman ($5,-000); and King ($2,500). Hill also failed to disclose the Kriedler investment made on December 26, 1967 or that Kriedler was investing for a group of six.[2] It is not certain whether Gedalecia would have rendered the same opinion had he known of these additional investors.

More importantly, the evidence establishes that Hill failed to follow his counsel's advice. Gedalecia knew that Hill was selling a combination unit of both notes and rights to the PMI investors. However, the opinion only claims a specific exemption for the notes but not for the rights. Therefore, since Hill was also selling rights, if he were to follow the opinion of counsel, it was necessary that the offering stay within the private placement exemption of § 4(2). However, Hill failed to act in such a manner as to maintain a private placement. Gedalecia had informed Hill that the maximum number who would qualify for a private placement was "a mere handful." Nevertheless, Hill continued offering the notes and admittedly sold to 49 direct purchasers. He also permitted fragmentation and continued direct sales after he had knowledge of fragmentation.

■ In summary, the counsel's opinion was written predicated on the maintaining of a private placement exemption. Hill had not fully disclosed the number of purchasers to his attorney and after the opinion was rendered, he acted in such a manner as to destroy any possibility of a private offering. Under these circumstances the opinion provides no shield to a violation of § 5.

■ Alternatively, while reliance on an opinion of counsel may constitute a defense, where the crime requires specific intent, it does not if only knowledge of the facts is required. Custer, 247 F. Supp. at 503. Although the courts did not address themselves directly to the issue, the discussion in United States v. Crosby, *supra,* which was followed by the court in United States v. Dardi, *supra,* confirms that this is the proper interpretation. In *Crosby* the broker defendants offered the defense of reliance on an opinion of counsel. The court found for the defendants because there was insufficient evidence that they had knowledge of the facts constituting an offense. The court clearly implied that if the defendants had had the requisite knowledge, they could not have claimed reliance on the opinion of counsel. See also, SEC v. Culpepper, 270 F.2d 241, 251 (2d Cir. 1959), following SEC v.

---

2. Examination of DX–7–A reveals that Hill did not disclose to the SEC, two investors who apparently redeemed their notes. (Barrett and Perl).

**1236**

Mono-Kearsarge Consol Mining Co., 167 F.Supp. 248, 256–259 (D.Utah 1958).

■ The injunction barred Hill from violating § 5 and § 17(a). The Court finds that he violated both statutes. For a finding of contempt, that is all that the Government is required to establish. The degree of intent or knowledge required for a finding of contempt is no greater than that required to violate the statute. See, Custer, 247 F.Supp. at 495–497 and authorities therein cited.

### The 1967 Injunction

■ Defendant now claims that the injunction was too broad and vague to support this contempt proceeding. This claim is completely without merit. Injunctions cast in terms of an underlying criminal statute are frequently used by administrative agencies. Such injunctions have been upheld and enforced by the courts. See, Custer, 247 F.Supp. at 484; United States v. Sherwood, 175 F. Supp. 480 (S.D.N.Y.1959); Frank v. United States, 384 F.2d 276 (10th Cir. 1967). There is no basis for a claim of vagueness. The scope of the injunction was coterminous with the statutes. Therefore, Hill's duties were no greater than any other person's.

In today's complex society it would be unreasonable to require injunctions to be more specific than that utilized here. There are an unlimited number of techniques which can be used to distribute unregistered securities or to make fraudulent misrepresentations when selling securities. Indeed, Hill's method of raising money for Nanosecond here differs radically from that employed before the injunction. No injunction could be written anticipating all such techniques, and any injunction which attempted to would be far broader and more harsh on the defendant.

■ Furthermore, this defendant may not now claim that he was in any way prejudiced by the injunction. He stipulated to its terms and requested its approval by the Court. He was not forced to stand trial for his earlier acts.

He conducted his affairs in a manner indicating he considered himself bound by its terms. He asserted that he had studied the law and he had private counsel, whose advice he sought, but then chose not to follow. It shall also be noted that he could have sought an SEC no action letter.

■ While Hill was aware of this procedure, he chose not to utilize it. As the Court has indicated above, Hill's violations were sufficiently flagrant, that they lacked even a colorable claim of legality. Finally, Hill could not challenge the injunction, even if it had been improper, by disobeying it; rather he was required to attack it directly through appeal or through a motion for modification. Pending such a determination, the injunction had to be followed. United States v. United Mine Workers of America, 330 U.S. 258, 289–295, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

The Court finds that the defendant, Dr. David L. Hill, has violated the injunction of this Court, dated July 17, 1967, in that he knowingly sold securities which were required to be registered under § 5 of the Securities Act; and in that when he sold securities, he knowingly omitted to state necessary material facts as required by § 17(a) of the Act. Hill is found therefore to be in contempt of the Court's injunction.

### Remedies

In United States v. Shillitani, 384 U. S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), the Supreme Court ruled that when a defendant is found in contempt of court, it is the duty of the court to consider imposing remedial sanctions before imposing harsher punitive measures. The appropriate disposition of this case is the imposition of a stricter injunction against Hill.

The Government would have the Court order, as a remedial sanction, that Hill caused the companies to offer recision to the former PMI noteholders, all of whom have since exercised their right to purchase Nanosecond stock. The Court has

considered this remedy but, in view of the fact that a recision offer was made at the outset of the trial (DX–1, 2, 3) and that the defendant has objected to this procedure on the ground that it would destroy these companies, the Court deems it inappropriate.

 This is defendant's second appearance before the Court in less than two years for serious violations of the Securities Act. His corporations are in such a state of development that it is not only possible but likely that they will need further funding in the near future, when the proceeds of the current offering have been exhausted. This proceeding demonstrates clearly the inadequacy of a general injunction to restrain this defendant. Therefore, as a remedial sanction the Court orders the Government to submit an appropriate injunctive order amending the existing injunction, which follows the outline given below, with appropriate notice to the defendant.

The injunction shall be directed solely against Hill, since neither Nanosecond nor PMI are parties here. It shall extend for *three* years from the date of entry of judgment. It shall provide that before Hill seeks to raise funds in a business venture, except pursuant to an effective registration statement, he shall submit to the SEC a proposal of his plans, requesting the opinion of the SEC as to whether registration is required. If the SEC does not respond within 30 days or if it states that no registration is required, the defendant may proceed with his plans. If the SEC states that it is of the opinion that registration is required, Hill may not offer the securities, except pursuant to an effective registration statement or pursuant to an order of this Court, which will retain jurisdiction for such purposes. The order shall contain an appropriate exemption from these requirements for funds sought from banks or other bona fide financial institutions. In fairness to the defendant, if the SEC grants its approval or fails to respond without good cause, the United States may not proceed against the defendant in any contempt proceeding, unless he fails to follow the plan as submitted. If the SEC unreasonably withholds its approval, the defendant may apply to the Court to remove the injunction. The injunction or SEC approval will in no way limit defendant's civil liability to any person. The general prohibition against violation of § 17(a) shall be included in the proposed order.

The Court is satisfied on the basis of the record that this is not a case where, for their own personal aggrandizement, those in control of a company sought to defraud investors. The record indicates that Hill under great financial pressure because of inadequate capital, was attempting, as best he could, to preserve his struggling corporations; and that he believed that the PMI noteholders were making a reasonable investment. Nanosecond is now proceeding to sell its stock pursuant to an effective registration statement and at least to date, it would appear that none of the PMI noteholders have lost their money. In the Court's view, the totality of all these factors represent sufficient mitigation to warrant the Court in not imposing punitive sanctions.

The most important objective is to uphold the purposes of the Securities Act. This is adequately accomplished in this case by the finding of guilty, with its resultant censure, and the imposition of a more restrictive injunction. The record indicates that it is necessary for Hill to be not only apprised of but impressed with his legal responsibilities. In a Memorandum to PMI investors, dated April 23, 1968, Hill's attitude is described, when he stated:

"Certainly we hold the view that the government should have no power to tell its citizens what investment decisions they shall make, or on what basis they shall make them. Therefore, questions regarding what information investors may have had to make their decisions can be an unwarranted intrusion by government into a private transaction." (PX–M).

The philosophy of this statement runs completely contrary to that of the Securities Act. In order to protect investors, the Government does tell issuers what information they must supply, when they seek to sell securities. At trial, he represented that he did not think he was violating the Act, when he sold the notes and that he did not believe at the conclusion of the trial that he had committed any violation. In these beliefs he was wrong.

The foregoing shall constitute the Court's findings of facts pursuant to Rule 23(c), Fed.R.Crim.P.