Charles E. BOWERS, Sr., et al.,
Plaintiffs,

v.

COLUMBIA GENERAL CORPORATION
et al., Defendants.

Civ. A. No. 4248.

United States District Court,
D. Delaware.

Dec. 27, 1971.

James M. Tunnell, Jr., Andrew B. Kirkpatrick, Jr., and Richard S. Paul, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Richard H. Keatinge, Robert Yale Libott and Frank E. Merideth, Jr., of Keatinge, Libott, Bates & Loo, Los Angeles, Cal., of counsel for plaintiffs.

Arthur G. Connolly, Jr., and John R. Bowman, of Connolly, Bove & Lodge, Wilmington, Del., and Keehn Landis, Voyle C. Wilson and Richard A. Makarski, of Chapman & Cutler, Chicago, Ill., of counsel for defendants.

## OPINION

STAPLETON, District Judge.

This action seeks injunctive relief, rescission and damages for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, breach of contract and fraud. The matter is currently before me on plaintiffs' motion for a preliminary injunction.

Prior to October 29, 1970, plaintiffs owned all of the outstanding capital stock of Fibre-Metal Products Company, a Pennsylvania corporation engaged in the manufacture and sale of welding and industrial safety supplies ("Fibre-Metal"). Fibre-Metal's business was founded in 1905 by Frederick M. Bowers. Plaintiff Naomi Bowers is his widow. Plaintiffs John Bowers and Charles Bowers, Sr. are his sons and plaintiff Charles Bowers, Jr., is his grandson; as of the fall of 1970, each of these three had occupied executive positions with Fibre-Metal for approximately 25 years. Up until that time Fibre-Metal had always been owned and operated by members of the Bowers family.

Defendant Columbia General Corporation, a Delaware corporation, ("CG") was organized in October of 1968 as a result of an amalgamation of two other enterprises. In the period between October 1968 and the present, CG has had serious acquisition discussions with approximately 25 business entities. These discussions resulted in 10 consummated acquisitions.

In the spring of 1970, Fibre-Metal and CG began merger discussions. After several months of negotiations, the acquisition of Fibre-Metal by CG was closed on October 29, 1970. For the purpose of effecting the acquisition, CG formed a wholly owned subsidiary, CGA, Inc., a Delaware corporation. Fibre-Metal was merged into CGA, Inc. whose name was contemporaneously changed to Fibre-Metal Products Company ("FM"). Immediately prior to the merger, CG transferred to CGA, Inc., as a contribution to capital, the capital stock and rights of CG necessary to consummate the merger. Upon the effective date of the merger, the capital stock in Fibre-Metal was converted into 200,000 shares of CG Common Stock, 200,000 shares of CG Series C Cumulative Convertible Preferred Stock, 7,000 shares of CG Series D Cumulative Preferred Stock,[1] and certain "participation units" evidenced by "Participation Certificates". In addition, the holders of the common stock of Fibre-Metal were given the right to receive up to 233,334 shares of CG Common Stock from an escrow agent in the event that the business of FM, measured by its "net income" as defined in the agreement, exceeded certain specified levels during fiscal 1971, 1972 and 1973. Under the participation certificates, additional shares of CG Common Stock are issuable in the event that the CG shares become issuable under the escrow agreement but have an aggregate market value of less than a specified amount.

Pursuant to the Plan and Agreement of Reorganization, Charles Bowers, Jr. was employed as the Chief Executive Officer of FM and Charles Bowers, Sr. and John W. Bowers were employed as con-

---

1. The holders of Fibre-Metal's only class of preferred stock received solely Series D Cumulative Preferred Stock of CG.

sultants of FM, all for a period of five years. The Board of Directors, however, was to consist, and does consist, of four nominees of the former Fibre-Metal management and five nominees of CG management.

The complaint in this action sets forth seventeen claims. In connection with their application for preliminary relief, however, plaintiffs stress the five of these claims which they believe entitled them to rescission of the above-described transaction. In plaintiffs' First claim, it is alleged that the offer and sale of CG stock to plaintiffs violated Sections 5 and 12$l$(1) of the Securities Act of 1933 in that no registration statement was in effect with respect to the CG stock issued to plaintiffs and no exemption from the Act's registration requirements was available.

In plaintiffs' Second, Third and Fifth claims, it is alleged that defendants made certain untrue statements of material fact and omitted to state certain material facts in connection with the acquisitions of Fibre-Metal by CG in violation of Sections 12(2) and 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

In plaintiffs' Sixth claim, it is alleged that defendants have engaged in certain conduct in violation of the agreement and for the purpose of preventing the issuance to plaintiffs of the stock subject to earn-out, such conduct constituting a ". . . course of business which operates or would operate as a fraud or deceit . . . in connection with the purchase and sale of" a security in violation of Subsection (3) of Rule 10b-5.

## I. THE APPLICABLE LEGAL STANDARDS.

 When an application for a preliminary injunction is made, the moving party has the burden of showing that he is entitled to the relief sought based upon the following criteria: "(1) irreparable harm to . . . [the moving party], absent such stay; (2) absence of substantial harm to other interested parties; (3) absence of harm to the public interest; (4) a likelihood that . . . [the moving party] prevail on the merits." Winkleman v. New York Stock Exchange, 445 F.2d 786 (3rd Cir. 1971); Nelson v. Miller, 373 F.2d 474 (3rd Cir. 1967); Babcock v. Local Bd. No. 5 for State of Del., 321 F.Supp. 1017 (D.Del.1970).[2]

 I see in the present application no potential of injury to the public interest.[3] Determination of the issue presented, accordingly, requires the Court to evaluate and weigh the potential irreparable injury to plaintiffs in the ab-

2. One further criterion has occasionally been mentioned in the opinions of this Court and others: the absence of a serious dispute between the parties as to the facts alleged and the law applicable. *E. g.,* N. W. Controls, Inc. v. Outboard Marine Corporation, 317 F.Supp. 698 (D. Del.1970). Analytically, it seems to me that this is not so much a separate criterion as simply a recognition of two well established principles. First, the moving party carries the burden of convincing the Court that he is entitled to preliminary relief under the above listed criteria and where the motion is presented upon affidavits, as has been the traditional and consistent practice in this Court, the sworn statements submitted by the opposing party are ordinarily to be given the same weight as conflicting sworn statements of the moving party. Warner

Brothers Pictures v. Gittone, 110 F.2d 292 (3rd Cir. 1940); Murray Hill Restaurant v. Thirteen Twenty One Locust, 98 F.2d 578 (3rd Cir. 1938). Second, a court should ordinarily decline to decide novel questions of law on less than a complete record. This fifth criterion should not be interpreted to mean that the moving party must establish his right to ultimate relief beyond doubt, Bergen Drug Company v. Parke, Davis & Company, 307 F.2d 725 (3rd Cir. 1962), that the presence of a novel legal question bars preliminary relief, or that the court is foreclosed from evaluating a sworn statement in light of the overall record.

3. While the public has an interest in the enforcement of the federal securities law, that interest will be satisfactorily served by the ultimate judgment in this case should a violation be established.

sence of preliminary relief, the potential irreparable injury to other interested parties in the event such relief be granted, and the probability of plaintiffs' ultimate success.

## II. POTENTIAL IRREPARABLE INJURY TO PLAINTIFFS AND OTHER INTERESTED PARTIES.

Before examining plaintiffs' specific claims concerning irreparable injury, preliminary comment is appropriate. Plaintiffs assert that defendants, unless enjoined, will engage in various transactions involving the business and assets of FM which not only will be injurious to FM, but will also render meaningless any right plaintiffs may have to rescission [4] or to damages for violations of the "earn-out provisions" of the Plan of Reorganization. Plaintiffs also maintain that the proposed transactions and the possibility of irreparable injury therefrom must be evaluated in the context of a behavior pattern on the part of defendants which, according to plaintiffs, demonstrates their bad faith.

It is not surprising, in the context of a situation in which the parties have views about business policy as divergent as those which exist here, to find that one side questions the good faith of the other. At the current stage, however, I am not prepared to conclude that any of the defendants have acted in bad faith. As hereinafter indicated, the principal charges of misrepresentation in the negotiation of the Plan of Reorganization are inconsistent with the express terms of the agreement itself. The attempt to take corporate action without a directors' meeting when all directors of FM did not approve of that action, while apparently in violation of

Delaware law,[5] does not compel an inference of bad faith. There was nothing surreptitious about these proceedings; those holding the minority view were informed of the proposed action, were given the opportunity to record their dissent, and approved in the procedure,[6] apparently in the interest of saving the expense of getting the directors together for a meeting. Finally, I am satisfied that the attempt to hold a meeting of the FM board to ratify the actions contained in the challenged written consents, whether or not in violation of the letter of the Stipulated Temporary Restraining Order then in effect, was not calculated to circumvent the purpose of that Order. Accordingly, I think the question of the probability of irreparable injury must be decided without reference to any alleged bad faith on the part of the defendants.

To the extent plaintiffs' claim of irreparable injury is bottomed upon their claimed right to rescission, it is important to recognize that it is now, and will in the future be, impossible to put plaintiffs in exactly the same position they occupied prior to October of 1970. To some degree, Fibre-Metal as a business enterprise was altered upon the consummation of the reorganization; it has been further altered since that time.[7] Indeed, it undoubtedly would be different today than in September of 1970 even if it had remained solely in the hands of the Bowers family. In short, business assets, in order to retain their value, need to be managed; changes need to be made to adapt to changing conditions.

This, of course, does not mean that preliminary relief is never appropriate in a rescission case of this kind. Chang-

---

4. Section 12 of the Securities Act of 1933 expressly provides for rescission as a remedy where the plaintiff still holds the securities purchased. Plaintiffs contend that rescission is a "judicially implied" remedy for violations of Section 17(a) of the Securities Act and Rule 10b-5 under the Securities Exchange Act of 1934. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

5. 8 Del.C. § 141(b) and (f).

6. The minority directors signed the consent form after it was altered to reflect their dissent.

7. A number of the challenged changes in FM's marketing program, for example, have already been effectuated.

es may be proposed which will involve third parties or otherwise preclude effective remedy by way of rescission. Compare Deckert v. Independence Shares, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). It does mean, however, that where it appears that the court can allow a business to be managed by its board of directors and still do substantial justice if and when the time for rescission comes, it should not restrict management by preliminary order for the purpose of freezing the corporation's assets and the form of its business operations. The powers of a court of equity are sufficient to make this unnecessary. 3 Black, Rescission and Cancellation, §§ 616, 633, 688 and 689 (2 ed. 1929);[8] cf. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

These considerations bear upon the question of the probability of injury to defendants FM and CG, and to CG's stockholders in the event a preliminary injunction be entered. The choice here is not between management of FM's business by FM's board of directors or by plaintiffs. The choice is between management by FM's board of directors and partial management by that board. While I am not persuaded that the consequences to CG of the entry of a preliminary injunction would be quite as dire as defendants maintain,[9] it is true that the threat of some loss is a real one. A preliminary injunction foreclosing any of the threatened acts which plaintiffs find menacing could result in substantial loss to FM, CG and CG's stockholders, either by way of missed opportunity or by way of inability to adapt to changed business conditions.

CG's stockholders have a substantial interest in having the affairs of FM managed by its board of directors. While the interests of the majority of FM's board are not identical to those of the plaintiffs, these men do have an interest in seeing FM survive and prosper, and, of course, are accountable to plaintiffs and the other stockholders of CG for any breach of their duty in this regard. Unless and until it is shown that an imminent transaction will foreclose this Court from doing substantial justice by way of rescission, I believe the management of FM and CG should be left to pursue their fiduciary duties unfettered by Court order.

With this background, I now turn to the plaintiffs' specific claims of threatened irreparable injury. They fall into six categories.

1. *The threatened transfer of stock of the FM subsidiaries and other assets of FM to other entities in CG's corporate family.*

With one exception hereinafter discussed, FM markets and distributes its products through warehouses operated by six FM subsidiaries. Plaintiffs allege and defendants concede that unless a preliminary injunction is entered, the stock of these subsidiaries will be transferred to VanDresser & Hawkins, Inc., a wholly owned subsidiary of CG. The proposed form of this transaction is the transfer of the stock from FM to CG as a dividend and a subsequent transfer

---

8. Black's discussion of rescission, as a return to the *status quo*, answers much of plaintiffs' argument here:

. . . And an application for the rescission of a contract, when made to a court, is addressed to its sound discretion and is governed by equitable principles, and will not be granted unless the court can and does, by its decree, restore the parties substantially to the position which they occupied before making the contract. But the rule does not mean that there must be an absolute and literal restoration

of the exact previous condition, but such a restoration as is substantial, without material difference, and reasonably practicable, or, where fraud is involved, as nearly complete as the fraud of the opposite party will permit. . . .
3 Black, *supra*, pp. 1484–5.

9. On the present record, the supposed threat of the SEC's suspending trading of CG stock in the event a preliminary injunction is entered, for example, seems remote at best.

of the stock from CG to VanDresser & Hawkins, Inc. as a contribution to capital. Assuming valid corporate authorization, which plaintiffs maintain has not occurred so far as FM is concerned,[10] the legality of these transactions under the Delaware Corporation Law is not attacked by the plaintiffs. An affidavit of CG's chief executive officer cites a number of business considerations which he feels dictate the proposed transfers. Plaintiffs dispute the wisdom of the transfers and maintain that they will jeopardize plaintiffs' right to rescission as well as their rights under the "earn-out" provisions. They further assert that this transfer as well as other actions of the defendants may jeopardize FM's credit and cause several of its creditors to accelerate the maturity on the indebtedness of FM with dire consequences.

The affidavits of CG's chief executive officer and executive vice president state that at no time has any proposal or plan for the reorganization of FM's distribution system contemplated the creation of any lien or encumbrance upon the stock of any subsidiary or any transfer outside the CG family of corporations. While plaintiffs speculate that the stock might be incumbered, there are no facts set forth in plaintiffs' affidavits which controvert the above statements. It follows that, unless some further action not now contemplated is taken, these subsidiaries could be returned to FM as a part of a plan of rescission.

■ I realize that this fact does not completely allay plaintiffs' fears. Two of the objectives of the transfer are to bring what defendants refer to as Van-

Dresser & Hawkins management expertise to bear upon the operation of the subsidiaries and to better enable the subsidiaries to acquire lines of products manufactured by companies other than FM. It is clear that changes in the operations of these subsidiaries are contemplated. As previously noted, however, change *per se* does not require restraining judicial action in this context. While it is conceivable that changes could be effected in the operations of these subsidiaries which would jeopardize the ability of the Court to do substantial justice by rescission, the current record does not provide a sufficient basis for reaching the conclusion that changes of this character are threatened.[11]

Plaintiffs further assert that the transfer of FM's subsidiaries will result in action by FM creditors which will irreparably injure FM. The sole record basis for this assertion is the affidavit of a vice president of First Pennsylvania Bank and Trust Company, to which FM is indebted in the approximate amount of $2,558,743, which states that if the transfers are not restrained:

. . . the Bank may be obliged to reconsider its position with respect to the loans described in paragraph 2 above in light of the weakening of the financial strength of Bank's primary obligor, Borrower [Fibre-Metal], and as a result of such reconsideration, the Bank may, to the extent it may legally do so, accelerate the maturity of all such loans.

It is to be noted that First Pennsylvania does not here take the position that there has been any breach of the loan

---

10. FM has demonstrated an intention to secure such valid authority and the composition of FM's board indicates that such can probably be obtained.

11. Plaintiffs assert that the addition of other lines will substantially reduce FM's profits from its manufacturing activities. At the present, this assertion remains speculative. Moreover, to the extent any such changes are the product of honest business judgment, balancing the equities, I find the exercise of discretion of FM's

board in this area preferable to no management at all. To the extent that any such changes are the product of other considerations, a court of equity is not powerless to grant adequate relief in a plan of rescission. Where a transferor is entitled to rescission, for example, the transferor must account for waste as well as return the property. Black, Rescission and Cancellation, §§ 633, 688 (2 ed. 1929). See also 5 Williston, Contracts, § 1464 (1937); 5A Corbin, Contracts, § 1223 (1964).

agreement or that it is legally entitled to accelerate the maturity of the loans thereunder. The affidavit of CG's chief executive officer denies that there has been any breach. The agreement itself has not been submitted to the Court and it is, accordingly, unable to determine whether there is or might be a right of acceleration. This leaves the Court only with a statement by the Bank that it will be "obliged to reconsider its position" if a preliminary injunction is denied. This is an insufficient basis for injunctive relief.

█ Finally, plaintiffs assert that from an accounting standpoint the proposed transfers will so intermingle the "business of FM", as defined in the Plan of Reorganization, with the affairs of other CG subsidiaries as to preclude either meaningful rescission or application of the formula contained in the "earn-out" provision. This argument has two facets. Plaintiffs maintain this is true under the present CG accounting system and that this problem will be even further complicated if CG institutes a proposed new computerized accounting system for the warehouse subsidiaries.

Plaintiffs' argument with respect to the present accounting system is supported by a conclusory affidavit of an accountant whom plaintiffs have apparently recently retained. The charge is denied in a conclusory affidavit of a partner of the firm of Arthur Andersen & Company, which advised plaintiffs in connection with the negotiation of the "earn-out" provision. In the absence of anything more specific regarding the current situation, I find the most persuasive portion of the record to be the Plan of Reorganization in which the parties implicitly acknowledged the feasibility of applying the "earn-out" provision in the event portions of the FM business were transferred to other entities in CG's corporate structure. The earn-out provisions of the escrow agreement, the Certificate for Units of Participation, and the incentive compensation provisions of the employment agreement of Charles Bowers, Jr. contain the following provision or one virtually identical to it:

"Business of CGA" shall mean the business operations of Fibre or its subsidiaries or affiliates, as the same shall exist on the effective date of the merger provided for in the Plan and any extensions of such business operations which may subsequently be made by CGA. The business of CGA may be carried on by Columbia in one or more of the separate corporate forms in which CGA or its subsidiaries or affiliates exist on the above date or in a new subsidiary of Columbia organized for the purpose of acquiring the business of CGA or as a division of Columbia. Should the business of CGA not be carried on in separate corporate form, Columbia shall nevertheless continue to account for the business of CGA in such manner as to facilitate the determinations and computations required hereby.

The parties to the Plan of Reorganization and other agreements incorporated by reference therein went on to provide a mechanic for resolving any disputes in connection with the application of the "earn-out" provisions or the incentive compensation provision:

The amount of Net Income set forth in each of said audited statements of Net Income of CGA to be prepared pursuant to this Section shall in each case be binding and conclusive on CGA, Columbia and the Shareholders and all other parties in interest, unless the shareholders shall notify Columbia, within ten days of the receipt thereof, that they dispute such report. If Columbia and the Shareholders are unable to resolve any such dispute, it shall be settled by an independent public accountant chosen by Arthur Andersen & Co. and the Shareholders' independent public accountant. The decision of said third party accountant shall be final and binding upon Columbia and the Shareholders both as to law and to fact and shall not be ap-

pealable to any court in any jurisdiction.[12]

These two contract provisions make it clear that the parties anticipated the restructuring of FM's business in a manner similar to that which has in fact occurred and determined that the earn-out and incentive compensation provisions could be applied in this context.

 The proposed new computerized accounting system may present a more difficult problem. The affidavits of plaintiffs' accountants state that under the new system it will be impossible to prepare the "audited financial statements" called for in the agreements. This statement stands uncontradicted in the record. The matter was first raised, however, in plaintiffs' reply affidavits and defendants have had no opportunity to respond. In the absence of a description of the system itself and its effect, it is impossible to evaluate its impact. Defendants' counsel represented to the Court at oral argument that no final decision had been made to institute a new system. If and when such a decision is made, plaintiffs may evaluate the proposed change and seek relief if neces-

sary.[13] At present, I find that plaintiffs will be adequately protected by an order directing that defendant FM serve notice upon the plaintiffs and the court thirty days before any new computerized system is inaugurated, which notice shall describe the contemplated change.[14]

2. *Transfer of the in-house sales force of FM and the supporting assets to the newly formed subsidiary of Van-Dresser & Hawkins, Inc.*

At the time of the acquisition, there was one method of distribution used by Fibre-Metal which was an exception to its normal practice of selling through subsidiaries. In the east, Fibre-Metal's sales were made by its own salesmen directly to the retail distributors. Profit analyses made by Paul Scott, the Treasurer of Fibre-Metal under the Bowers management, indicated that the eastern distribution operation was operating at a loss. The affidavits of CG management personnel state that as a result a new subsidiary, known as "VanDresser & Hawkins Atlantic, Inc.", was created. The "in-house" sales force of FM was moved to a new office near the old plant

12. It is not necessary at the present time to pass upon the validity or effect of this provision.

13. The Court's conclusion that plaintiffs have not as yet demonstrated a probability of success would not automatically bar relief on such an application. Discovery is proceeding and additional facts supporting plaintiffs' theories on the merits may conceivably be developed. Moreover, it has been repeatedly recognized that the moving party's burden with respect to one criterion may be affected by the strength of his proof with respect to another. Thus, for example, upon a strong showing of irreparable injury, the courts have required less on the issue of the probability of ultimate success, and vice-versa. See Kontes Glass Company v. Lab Glass, Inc., 373 F.2d 319 (3rd Cir. 1967); Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1056 (1965).

14. Plaintiffs also complain of the payment by FM to CG of charges for administrative services or management fees in the amount of $6,000 per month. This

is said to be in excess of the $2,000 per month limit agreed to by the parties. Defendants respond that a limit of $25,-000 per year was agreed upon but that it applied only to the maximum charge against net income for purposes of the "earn-out" and the incentive compensation. The written agreements do set a $25,000 per year limit only in the context of calculating the earn-out and incentive provisions but add that such payments shall be "approved by two-thirds of CGA's Board of Directors." This *may* indicate an intent broader than that asserted by defendants, and plaintiffs' affidavits that no director action has been taken stand uncontradicted. For present purposes, however, it will suffice to say that if a breach of duty has occurred, any excess fees should be recoverable either by way of a claim by FM against CG or by way of an accounting for profits in conjunction with the return of the plaintiffs' property. Black, Rescission and Cancellation, §§ 688, 689 (2 ed. 1929); Restatement, Contracts, § 354, comment (c).

and certain inventories were purchased for cash from FM by VanDresser & Hawkins Atlantic, Inc.

I find the same considerations relevant here as in the case of the transfer of the stock of the distributing subsidiaries and reach the same conclusion. I am not convinced that the continuation of this activity in the current corporate form will jeopardize the ability of the Court to do substantial justice by way of rescission or will preclude application of the earn-out and incentive provisions agreed to by the parties.

3. *Threatened discharge of FM management personnel and employees.*

■■■ In the affidavits submitted by Charles Bowers, Jr. in support of the original *ex parte* application for a temporary restraining order, he explained that there are many management and operations personnel who have been with Fibre-Metal for many years, who have special experience and skill with respect to its operations, and who have developed considerable loyalty to the Bowers management. He then went on to state:

> Defendants have already sought to procure the resignations of certain officers, directors and employees of Fibre-Metal's subsidiaries who were loyal to the current management of Fibre-Metal. As a result of their efforts to deprive Fibre-Metal of its subsidiaries as discussed in paragraph 6 through 14 of this affidavit, I am convinced that upon the filing of this action, defendants will take immediate action, with or without proper authority, to remove all members of the Bowers family, and all persons loyal to the Bowers family, from their positions as employees, officers and directors of Fibre-Metal and its subsidiaries. Such action would irreparably damage Fibre-Metal in that such employees, officers and directors are experienced in the business of Fibre-Metal and its subsidiaries and necessary for their continued profitability.

While the evidence of friction between the parties was such that one can understand how this conviction was formed, the Court felt that the defendants' own self interest make it unlikely that any such wholesale purge would occur upon receipt of the notice. The *ex parte* application was denied. No purge ensued. The Court still feels the same way. The friction between the parties has obviously developed gradually over the last year and yet the record reveals no discharges attributable to the feud. In short, I find the threat of a purge too remote to justify an injunction tying management hands in matters of personnel.

■■■ The alleged threatened discharge of Charles Bowers, Jr. presents a somewhat different situation and warrants further comment. Defendant FM disavows any intention to breach Mr. Bowers' employment contract, but intimates that discharge may soon be considered if he refuses to carry out the directives of the Board. Plaintiffs concede that a breach of an employment contract ordinarily gives rise only to money damages at law. They maintain, however, that this case is extraordinary because management by Mr. Bowers is essential to avoid dissipation of FM's assets and because "the earn-out provisions . . . become farcial [sic] should control of the company be wrested away from plaintiffs by the unilateral action of defendants."

I do not pass on whether any discharge of Mr. Bowers in the future will be legally valid. It will suffice for present purposes to say that I am not convinced that the absence of Mr. Bowers from the management of FM during the pendency of this case would have the effect claimed by plaintiffs and to note that plaintiffs' argument erroneously assumes that the management of FM is currently in Mr. Bowers' hands. The management of FM is currently in the hands of FM's board of directors and plaintiffs neither have asked that it be placed in the hands of Mr. Bowers nor have they made a showing which would

entitle them to extraordinary relief of this character.

### 4. *The threatened sale or lease of the Concordville plant.*

In about January of 1965, the then management of Fibre-Metal decided that its plant in Chester, Pennsylvania, would soon be unsatisfactory for the operations of the company. A decision was made to construct a new plant. By October 29, 1970, the date of the closing of the acquisition of Fibre-Metal by CG, the new plant, located at Concordville, Pennsylvania, was nearly completed. As of January 31, 1970, Fibre-Metal had incurred aggregate expenses in connection with this project in the amount of $1,068,729.31.

Defendants contend that analyses made subsequent to the acquisition dictate that the move to the Concordville plant must be aborted and that the plant should be sold or leased as soon as possible. Plaintiffs deny that the proposed plan to relocate was ill-conceived. They correctly point out that the plant is the largest single asset of FM and that it was designed for the specific purpose of housing FM's manufacturing operation. They conclude that the retention of the Concordville plant is crucial to the continued success of FM, and that the transfer of this facility during the few months pending trial would result in a totally meaningless rescission remedy.

The proposed sale of the Concordville plant is one of the primary bones of contention between the parties. The nature and value of this facility make it a unique asset. This fact and defendants' confessed desire to alienate the facility provide by far the strongest support for plaintiffs' argument of irreparable injury. It is clear from the record, however, that defendants do not currently have a prospective purchaser or lessee and well may be unable to secure one in the near future. While the sale or lease of the Concordville plant might frustrate the rescission remedy in this case, it seems to me that the threat of such frustration is not yet imminent. Moreover, if the FM management decides upon a lease, for example, the terms of that lease might have a material bearing on the degree of injury or frustration. Here also, I have concluded that plaintiffs, for the present, will be sufficiently protected by the entry of an order directing that defendant FM serve notice upon plaintiffs and the Court thirty days before any proposed alienation of the facility or any interest therein. Such notice should provide a description of the proposed transaction.

### 5. *The threatened closing of FM's West German operation and the threatened borrowing of "excessive monies".*

Defendants FM and CG concede that they believe FM's West German operation should be terminated. Plaintiffs apparently do not dispute that this operation is currently unprofitable. Beyond this, the record is devoid of any facts from which the Court could infer irreparable injury to plaintiffs from the proposed closing of this operation. Once again, the threat of change, *per se*, is not enough.

Plaintiffs' brief indicates that they fear a "borrowing of excessive money which would so burden the company as to make . . . rescission [a] return of only a meaningless shell." With the exception of the charge hereinafter considered that CG is short of cash, I find no record support for this fear.

### 6. *The financial condition of CG.*

Plaintiffs contend that the "cash position" of the CG family of corporations has "greatly deteriorated" and that this is relevant to plaintiffs' ability to recover damages as well as "to the likelihood of the stripping of assets pending trial." They point to the fact that CG consolidated financials and a report to its directors, dated September 30, 1971, show cash on hand as of August 31, 1969 of $3,360,521, as of August 31, 1970, as

$2,283,955, and as of August 31, 1971, as approximately $800,000.[15]

The record does not show the reason for the reduction in cash on hand during fiscal 1970. It does show that in July of 1971 CG redeemed 750,000 shares of its Series D Preferred Stock held by SMC Investment Corporation for $1,-800,000 in cash, plus notes and warrants.[16] Plaintiffs apparently question the wisdom of this redemption but not its legality.

These facts alone could lead one to a number of conclusions other than the one which plaintiffs have apparently reached. They do not, in my judgment, demonstrate an imminent threat to FM or the plaintiffs.

## III. THE PROBABILITY OF PLAINTIFFS' SUCCESS.

### A. Section 12(1) Recovery For A Section 5 Violation.

#### 1. The Fibre-Metal Acquisition Considered As A Separate Offering.

Section 12(1) of the Securities Act of 1933, 15 U.S.C.A. § 77l(1), states:

Any person who—

(1) offers or sells a security in violation of section 77e of this title * * *.

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Subsection 5(a) and (c) of the Securities Act of 1933, 15 U.S.C.A. § 77e, provide:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) To make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale * * *.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *.

Defendants CG and FM concede that there was no registration statement in effect as to any of the securities issued by CG in the Fibre-Metal acquisition and that interstate facilities were utilized in connection with this transaction. Defendants deny, however, that there was an offer or sale within the meaning of the Act, relying upon Rule 133 of the regulations promulgated under the Act, and contend, in the alternative, that the transaction came within the private of-

---

15. The directors' report indicates that CG is in the process of raising approximately $500,000 to $750,000 in additional working capital through the issuance of subordinated notes. CG's current assets and current liabilities were $11,160,825 and $3,941,996, respectively, as of August 31, 1969, and $11,608,001 and $5,456,955, respectively, as of August 31, 1970.

There is no comparable data in the record as to August 31, 1971.

16. SMC Investment Corporation is not alleged to be related to CG or its management in any way and, accordingly, I assume that this transaction was negotiated at arms length.

fering exemption found in Section 4(2) of the Act.[17] 15 U.S.C. § 77d(2).

For present purposes, I find it unnecessary to decide whether the so-called "no sale provisions" of Rule 133(a) are applicable to the situation before me.[18] I assume without deciding that CG offered to sell and did sell the securities issued in the transaction to the stockholders of Fibre-Metal and that the stockholders of Fibre-Metal are offerees and purchasers.

Turning to defendants' contention that the offering of the CG securities was not a public offering, I find that the following facts can fairly be inferred from the record:

1. There were no offerees other than those who purchased and those who purchased did not purchase with a view to redistribution. The relevant class is, accordingly, limited to the actual purchasers. This group, consisting of four individuals and a testamentary trust,[19] were all closely related by family ties and by their common interest as the sole stockholders of Fibre-Metal.

2. Those who negotiated the transaction on behalf of Fibre-Metal, Charles Bowers, Sr., John Bowers and Charles Bowers, Jr.,[20] each had at least 25 years experience in the active management of a business with a substantial manufacturing operation and a nationwide sales distribution.[21] As plaintiffs describe it, Fibre-Metal was "one of the oldest and most respected manufacturers and distributors of industrial safety supplies in the world." While the experience of these gentlemen was with a business enterprise somewhat different in character

17. Assuming that there has been a sale, it is clear that plaintiffs will be able to establish a *prima facie* case at trial and that the burden will be on the defendants to establish that the transaction came within the Section 4(2) exemption. Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971). While this is a factor to be taken into consideration in determining the probability of plaintiffs' success, it does not relieve plaintiffs at this stage of the burden of establishing such a probability.

18. Rule 133(a) provides as follows:
For purposes only of section 5 of the Act, no "sale", "offer", "offer to sell", or "offer for sale" shall be deemed to be involved so far as the stockholders of a corporation are concerned where, pursuant to statutory provisions in the State of incorporation * * * there is submitted to the vote of such stockholders * * * a proposal for the transfer of assets of such corporation to another person in consideration of the issuance of securities of such other person * * * under such circumstances that the vote of a required favorable majority (1) will operate to authorize the proposed transaction so far as concerns the corporation whose stockholders are voting * * * and (2) will bind all stockholders of such corporation except to the extent that dissenting stockholders may be entitled * * * to receive the appraised or fair value of their holdings.

If literally applied, this rule would decree that there has been no sale of securities in this transaction as far as the stockholders of Fibre-Metal are concerned. Plaintiffs, however, rely upon the so-called "negotiated transaction exception" to the rule, articulated by the Securities and Exchange Commission by way of dictum in Great Sweet Grass Oils, Ltd., 37 S.E.C. 683 (1969), aff'd. per curiam, 256 F.2d 893 (D.C. Cir. 1958). While a substantial argument can be, and has been, made that this "exception" is no longer viable [see 1 Loss, Securities Regulation, 539 (2nd ed. 1961), 2572 (Supp. 1969); Schneider, Acquisitions Under the Federal Securities Act—A Program for Reform, 116 U.Pa.L.Rev. 1323, 1325 n. 5 (1968)] there are clear indications that the Commission's staff would interpret Rule 133 as not being applicable to the facts of this case. *E. g.*, Moxie-Monarch-Nugrape Co., CCH Fed.Sec.L. Rep. ¶ 78,403 (1971). As noted above, I need not decide the question in order to dispose of the matter before me.

19. One of the purchasers was a testamentary trust established under the will of Frederick M. Bowers. Naomi T. Bowers, Charles Bowers, Sr. and Charles Bowers, Jr. are the trustees along with The Philadelphia National Bank.

20. Paul Scott, the chief financial officer of Fibre-Metal, also participated in the negotiations on behalf of Fibre-Metal.

21. Fibre-Metal, before the acquisition, had yearly sales of approximately $7,000,000.

from portions of CG's operations, it did provide them with a background which enables them to understand the importance of and to analyze financial and other operating data. This is apparent not only from the successful history of the Fibre-Metal enterprise but also from affidavits submitted in this case which interpret financial and operating data of CG and its subsidiaries.

3. Fibre-Metal and the Bowers were advised during the acquisition negotiations by a law firm and an accounting firm of acknowledged expertise in their respective areas. While both disclaim that they gave any investment advice per se, the law firm advised with respect to the information which should be obtained from CG and the accounting firm was available to assist in the interpretation of that data.

4. The Fibre-Metal management had the opportunity to, and did in fact, meet with the CG management on several occasions to discuss their respective businesses and the transaction. The Fibre-Metal management had the opportunity to, and did, make personal inspections of several of CG's physical facilities.

5. The management of Fibre-Metal, both from the standpoint of personal contact with the top management of CG as well as from the standpoint of bargaining leverage, was in a position, as a practical matter, to insist upon access to relevant CG data.

6. A substantial portion, though probably not all, of the information which a registration statement would have revealed was provided by CG to the Fibre-Metal management. Some of this information was solicited by the Fibre-Metal management and some was provided without a request. No request for information was denied.

7. The transaction itself was a negotiated and relatively complex one. The terms thereof, both from the standpoint of the amount of consideration to be given for the acquired corporation and from the standpoint of the character of the securities to be issued, were tailored to this specific transaction and indicate some degree of business sophistication on the part of Fibre-Metal's management.

8. The transaction was negotiated and consummated without utilizing the facilities of public securities distribution.

9. Each of the stockholders of Fibre-Metal warranted at the time of the closing that he considered himself to be "a knowledgeable and sophisticated investor" and confirmed that "prior to the purchase of the subject securities he . . . [had] made an independent investigation of the business and financial condition of Columbia General Corporation".

Plaintiffs' case must be evaluated in this context. They rely primarily upon the disputed contention that they did not have knowledge of much of the information which would have been provided in a registration statement and the undisputed fact that those negotiating the transaction on behalf of Fibre-Metal had relatively little prior experience with the purchase and sale of securities. If established at trial, plaintiffs' actual knowledge and their lack of experience with similar transactions may well be relevant to the ultimate disposition of the issues raised. These factors do not, however, establish the probability of plaintiffs' success in the context of the current record.

 The cases, the secondary authorities, and the legislative history indicate that the crucial issue here is whether the offerees had, or had access to, the information about the issuer and its business which would be disclosed by a registration statement. S. E. C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); United States v. Custer Channel Wing Corp., 376 F.2d 675 (4th Cir. 1967), *cert. denied,* 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed. 2d 119; United States v. Hill, 298 F. Supp. 1221 (D.Conn.1969); 1 Loss, Securities Regulation, 644 (2nd ed. 1961). I believe plaintiffs probably did not have

actual knowledge of all significant information which would have been revealed by a registration statement. Lack of actual knowledge, however, does not by itself preclude the application of the Section 4(2) exemption. If offerees have access to the relevant data as a matter of practical business reality, are reasonably equipped to deal with the information available to them, and choose not to take full advantage of their opportunity, I do not think that they are within the class which Congress sought to protect by enacting the Securities Act.

■■■■■ Plaintiffs insist that both "access" and "sophistication" on the part of the offerees must be established before the Section 4(2) exemption is available. I need not pass upon whether lack of sophistication is of crucial importance or upon the relative importance of these two factors. Plaintiffs' case on the "sophistication" point rests primarily upon the affidavits of the three Bowers who negotiated this transaction which explain that the experience of each with respect to the purchase and sale of securities has been limited to the purchase of a few blue chip securities listed on the New York Stock Exchange. Each affidavit further states, "I have never studied a prospectus, nor any other detailed financial or operational information for *the purpose of considering an investment in a company*." (Emphasis supplied) I do not think this is sufficient to establish a lack of sophistication on their part. If sophistication or lack thereof is relevant, the focus must be not so much upon prior experience with the purchase and sale of securities, but rather upon whether the offerees knew what to look for in, and how to interpret, the available information concerning the issuer's business and its profit potential. There are, of course, degrees of sophistication and the men who negotiated the transaction for Fibre-Metal may not be as sophisticated as some other business executives. The term must be given a realistic construction, however. Based upon the business background of these gentlemen it appears more likely than not that they will ultimately be found to possess the degree of sophistication required under the cases relied upon by the plaintiffs.

I do not hold that the facts recited in the nine numbered paragraphs above establish as a matter of law that the Section 4(2) exemption is applicable to this transaction. I conclude only that plaintiffs have failed to demonstrate a reasonable probability of ultimate success on this claim.

### 2. The Fibre-Metal Acquisition As A Part Of An Integrated Offering.

■■■■ Plaintiffs insist, however, that the Court in considering the availability of the Section 4(2) exemption should view the Fibre-Metal acquisition not only as an isolated transaction, but also, and independently, as a part of an integrated offering which CG has allegedly been making since October of 1968. Plaintiffs point to the fact that CG, during this period, has consummated ten acquisitions, has negotiated with respect to several other acquisitions, and has issued approximately 1,600,000 shares of its common stock.[22]

Plaintiffs concede that no court has yet applied the "integrated offering" doctrine upon which they rely. It is fair to assume, however, that a court will ultimately do so when confronted with a series of offerings of unregistered securities issued pursuant to a single financing plan which, if sanctioned would subvert the statutory scheme. The more substantial question concerns the factual circumstances under which the doctrine should be applied. For present purposes, I accept the guidelines suggested by the Securities and Exchange Commission and relied upon by the plaintiffs:

A determination whether an offering is public or private would also include a consideration of the question

22. There are apparently approximately 3,200,000 shares of CG common stock issued and outstanding, along with approximate-ly 1,717,000 shares of preferred stock issued in five different series.

whether it should be regarded as a part of a larger offering made or to be made. The following factors are relevant to such question of integration: whether (1) the different offerings are part of a single plan of financing, (2) the offerings involve issuance of the same class of security, (3) the offerings are made at or about the same time, (4) the same type of consideration is to be received, (5) the offerings are made for the same general purpose.

What may appear to be a separate offering to a properly limited group will not be so considered if it is one of a related series of offerings. A person may not separate parts of a series of related transactions, the sum total of which is really one offering, and claim that a particular part is a non-public transaction. (Release No. 33–4552, Nov. 6, 1962)

The record with regard to CG's other offerings is understandably sketchy at this stage. However, it appears that the shares of CG common stock issued, while substantial in number in relation to the outstanding common shares at the commencement of the period, were issued at varying intervals over a three year period in a number of diverse transactions. Most of these shares (1) were issued to acquire the unique businesses of closely held manufacturing and distributing corporations which were unrelated from the standpoint of ownership and which operated in different business areas and (2) were issued in individually negotiated transactions in which several forms of consideration were tendered by CG, including several types of securities which appear to have been tailored at the time to fit the needs or demands of the acquired companies.

On the current record, I am unwilling to infer any single plan of distribution on the part of CG's management. As it currently appears, the only thing tying together CG's various acquisitions during this time was perhaps a general willingness on the part of its management to issue its securities as and when an attractive acquisition opportunity presented itself. This alone does not dictate integration.

Once again, I conclude that plaintiffs have not demonstrated a reasonable probability of success.

### B. *Plaintiffs' Misrepresentation Claims.*

In addition to their claims based upon alleged violations of Sections 5 and 12(1) of the Securities Act, plaintiffs also seek rescission based upon alleged misrepresentations and omissions of material facts in connection with CG's acquisition of FM. This conduct allegedly violates other sections of the Securities Act as well as provisions of the Securities Exchange Act. The alleged misrepresentations and omissions may be summarized as follows:

(a) Defendants' failure to disclose that they would not permit Fibre-Metal to move to its newly constructed plant, or that they would reconsider the move;

(b) Defendants' written and oral statements that they allowed acquired subsidiaries relative autonomy on most matters and that they would give plaintiffs such autonomy in the management of Fibre-Metal;

(c) Defendants' representations that they would not unfairly distort the earnings of Fibre-Metal;

(d) Defendants' statements that they would cause CG to make available to FM some $500,000 of additional working capital; and

(e) Defendants' nondisclosure of certain facts related to the business background of CG's chief executive officer.

For the reasons hereafter set forth, plaintiffs have not persuaded the Court that they have a reasonable probability of success on their misrepresentation claims.

The subject matter of all but the first and last of plaintiffs' charges are dealt with, either explicitly or implicitly, in the Plan and Agreement of Reorganization

and related documents. The first allegation, relating to FM's move to its new plant, directs itself to the defendants' intentions during the merger negotiations. Plaintiffs claim that prior to the consummation of the negotiations, the defendants had already decided to block or at least reconsider the move but deliberately kept this a secret to avoid undermining the acquisition. Defendants say that they never thought at all about aborting the move until after the merger when they visited both the old and new facilities, and that they therefore had no secret, preacquisition intentions to keep from the plaintiffs. Defendants' version of the evolution of their decision to block the move is a plausible one. More importantly, it is supported by the most reliable evidence in the record bearing on the question. A *post-merger* press-proof of CG's 1970 annual report to its stockholders mentions FM's planned move to its new plant.

With respect to plaintiffs' last claim concerning the nondisclosure of defendant Boshell's background, it appears to the Court that the plaintiffs will be unable to show the necessary materiality of this information at the time of the negotiation. The nondisclosure of immaterial information is, of course, not a violation of the securities acts, and based upon the chronology of the episodes as revealed in the record, there is no substantial basis for concluding that a reasonable man during the relevant period would have considered the information allegedly withheld to be of substantial significance.

As heretofore noted, the three remaining alleged misrepresentations deal with matters covered in the reorganization documents. This is of significance for present purposes not because the terms of the agreement foreclose plaintiffs' claims based on previous events, but rather because these documents have substantial probative value in determining the understanding of the parties at the time of the closing.

First, plaintiffs claim they were promised "relative autonomy" in the operation of FM after the merger. They signed an agreement, however, which expressly contemplated an FM board of directors comprised of five CG nominees and only four Bowers' nominees.

Second, the allegation that defendants promised to provide FM with $500,000 of additional working capital is in direct conflict with the following provision of the documents:

> Issuer agrees that it will provide the business of CGA with such assets, funds or leasing arrangements for capital expenditures and working capital, at interest rates or lease charges, as the case may be, as are required to carry out the operational plans of CGA, subject to the requirements of Issuer's expansion program and other obligations of Issuer, including without limitation, its obligations to its stockholders.

Further, CG appears to have lived up to the commitment which it here made concerning working capital. CG has directly provided FM with additional working capital of $100,000 and has guaranteed loans of FM in the amount of $1,700,000, thereby making $300,000 in new money available.

Finally, with respect to the alleged misrepresentation that defendants would not distort the earnings of FM, there is no doubt that such a representation was made. The written agreement expressly so stated. Plaintiffs' burden at trial, however, will be to show that defendants had a contrary intent at the time. Here, plaintiffs presently rely principally upon the threatened transfer of FM's subsidiaries to CG. However, as noted above, transfers of this kind were expressly contemplated by, and provided for, in the documents. Accordingly, there is a strong inference that the parties had concluded that such transfers could be made without violating the associated prohibition against distorting the earning of FM's business. I do not conclude otherwise from the facts as they now appear.

C. *Plaintiffs' Claim Under Rule 10b–5(3).*

Finally, plaintiffs' claim that defendants have engaged in a course of conduct which is designed to operate as a fraud or deceit in violation of subsection (3) of Rule 10b–5. They here rely upon the proposed transfers of FM's distributing subsidiaries, the proposed sale of the Concordville facility, and the evidence which they feel demonstrates defendants' bad faith. It follows from what I have heretofore said about these matters that plaintiffs have failed to demonstrate a reasonable probability of success on this claim.

## CONCLUSION

In short, having considered the relevant criteria, I conclude that plaintiffs have not demonstrated that they are entitled to preliminary relief. This opinion contains the findings of fact and conclusions of law required by, and shall constitute the Court's compliance with, Rule 52(a) of the Federal Rules of Civil Procedure.

Submit order.